520 F.2d 709
 Adelaide HAMILTON, for herself and all others similarly
situated, Plaintiffs-Appellants,
v.
Earl L. BUTZ, Individually and in his capacity as United
States Secretary of Agriculture, et al.,
Defendants-Appellees.
 No. 75-1268.
 United States Court of Appeals,
Ninth Circuit.
 June 20, 1975.
 
 Donald E. Clocksin (argued), Juneau, Alaska, for plaintiffs-appellants.
 John M. Roger (argued), App. Section, Civ. Div., Dept. of Justice, Washington, D. C., Arthur Peterson, Asst. Atty. Gen. (argued), Dept. of Law, Juneau, Alaska, for defendants-appellees.
 OPINION
 Before ELY and HUFSTEDLER, Circuit Judges, and TAYLOR,* District Judge.
 ELY, Circuit Judge:
 
 
 1
 This is an interlocutory appeal from the District Court's denial of a preliminary injunction. 28 U.S.C. § 1292(a)(1) (1970). The appellants, plaintiffs below, sought to enjoin the Secretary of Agriculture (hereinafter "the Secretary") and other public officials[1] from considering funds paid to Alaska Natives[2] pursuant to the Alaska Natives Claims Settlement Act (hereinafter "the Settlement Act"), 43 U.S.C. § 1601 et seq. (Supp. II, 1972), as "resources" available to Native households in determining whether such households are eligible for assistance under the Food Stamp Act, 7 U.S.C. § 2011 et seq. (1970).[3] Concluding that the plaintiffs were unlikely to succeed on the merits of their claim, the District Court refused to grant a preliminary injunction, and the plaintiffs have appealed. We reverse.
 
 I. Statutory Background
 
 2
 In the Settlement Act, Congress sought to effect a fair legislative settlement of the Alaska Natives' aboriginal land claims.[4] The Settlement Act extinguishes any aboriginal titles that the Natives might have had to Alaskan lands and bars any claims based on such titles. 43 U.S.C. § 1603 (Supp. II, 1972). In compensation, the Act provides for the conveyance to the Natives of title in fee to 40 million acres of Alaskan land, 43 U.S.C. §§ 1610-1613 (Supp. II, 1972), and for payment to the Natives of $962.5 million in Federal and Alaska state funds, 43 U.S.C. §§ 1605, 1608 (Supp. II, 1972). To administer the transfers of money and land, the Settlement Act creates within Alaska a system of regional corporations, in which the Alaska Natives are equal shareholders. 43 U.S.C. § 1606 (Supp. II, 1972). The Federal Government is to deed the settlement lands and pay the settlement funds to the regional corporations.
 
 
 3
 The Settlement Act requires that the regional corporations distribute from 1972 to 1976 at least 45 percent of the settlement funds they receive to Native village corporations, which are smaller entities within the regions.[5] The regional corporations must also distribute at least an additional 10 percent of the funds they receive between 1972 and 1976 to individual Natives in the form of direct cash payments. After 1976, the regions are required to pay at least 50 percent of their settlement fund receipts to village corporations; however, they will not be required to make direct cash payments to those individual Natives who are members of village corporations. After 1976, the regions must pay individual Natives who are not members of village corporations their per capita shares of the 50 percent distribution to village corporations. 43 U.S.C. § 1606(j), (m) (Supp. II, 1972).
 
 
 4
 Within the Settlement Act, Congress set forth two declarations of policy that relate to the issue presented by this appeal. Congress declared that
 
 
 5
 no provision of this (Act) shall . . . relieve, replace, or diminish any obligation of the United States or of the State of Alaska to protect and promote the rights or welfare of Natives as citizens of the United States or of Alaska . . ..
 
 
 6
 43 U.S.C. § 1601(c) (Supp. II, 1972). Congress further declared that
 
 
 7
 no provision of this (Act) shall be construed to terminate or otherwise curtail the activities of . . . Federal agencies conducting loan or loan and grant programs in Alaska.
 
 
 8
 43 U.S.C. § 1601(g) (Supp. II, 1972).
 
 
 9
 Congress enacted the second act here involved, the Food Stamp Act, in order " . . . to promote the general welfare . . . (by utilizing) . . . the Nation's abundance of food . . . to safeguard the health and well-being of the Nation's population and raise levels of nutrition among low-income households." 7 U.S.C. § 2011 (1970). In administering the Food Stamp Act, the Secretary, in consultation with the Secretary of Health, Education and Welfare, is required to "establish uniform national standards of eligibility for participation by households . . .." Such standards must " . . . prescribe the amounts of household income and other financial resources, including both liquid and other financial assets, to be used as criteria of eligibility . . .." 7 U.S.C. § 2014(b) (1970).
 
 
 10
 Discharging his statutory duties, the Secretary has promulgated regulations specifying the amount of "resources" that a household may possess and yet remain eligible to receive food stamps. In pertinent part, the regulations are as follows:
 
 
 11
 (i) Maximum allowable resources. The maximum allowable resources including both liquid and nonliquid assets of all members of the household shall not exceed $1,500 for the household, except that, for households of two or more persons with a member or members age 60 or over, such resources shall not exceed $3,000.
 
 
 12
 (ii) Included in resources. In determining the resources of a household, the following shall be included and identified in sufficient detail to permit verification:
 
 
 13
 (a) Liquid resources which are readily negotiable, such as cash on hand, in a checking or savings account in a bank or other savings institution, U.S. Savings bonds, stocks or bonds;
 
 
 14
 7 C.F.R. § 271.3(c)(4) (1975).
 
 II. The Factual Setting
 
 15
 The District Court has certified this cause as a class action on behalf ofall persons in the State of Alaska who are Alaska Natives as defined in the Alaskan Natives Claims Settlement Act and who are, have been, or will be eligible for food stamps but for the requirement that their benefits under the Settlement Act be computed in determining their eligibility, and all Alaska Natives who must pay more for food stamps because their Settlement Act benefits are so computed.[6]
 
 
 16
 Hamilton, the named plaintiff, is a disabled, unemployed Alaska native who lives alone. In April, 1974, she received a settlement payment in the amount of $1,002 from her regional corporation. She deposited $1,000 of the payment in her bank savings account, thereby bringing the balance of that account to a total that was slightly greater than $1,500. Hamilton had been receiving food stamps since 1971. In August, 1974, she routinely reapplied for food stamps, but Alaska state officials, acting on the basis of Agriculture Department directives, included the full $1,500k balance in her savings account in totaling her resources and, consequently, denied her application. Hamilton then filed her complaint in the District Court, contending that Congress did not intend that settlement funds should be considered as "resources" for the purpose of determining her eligibility for food stamps.
 
 III. The Legal Issue
 
 17
 The District Court's refusal to grant a temporary injunction against the appellees was based solely upon the court's legal conclusion that the Settlement and Food Stamp Acts do not appear to support the plaintiffs' position. Consequently, the District Court's refusal to grant temporary injunctive relief is freely reviewable on appeal. We are not limited to a determination whether the District Court abused its equitable discretion, as would be the case had the court's refusal to grant temporary relief been based upon factual considerations. California ex rel. Younger v. Tahoe Regional Planning Agency, 516 F.2d 215 at 217 (9th Cir. 1975); Douglas v. Beneficial Finance Co., 469 F.2d 453, 454 (9th Cir. 1972); Developments in the Law Injunctions, 78 Harv.L.Rev. 994, 1070 (1965).
 
 
 18
 Our study of the Settlement Act and the legislative history surrounding its enactment convinces us that Congress did not intend that the distributions of funds to individual Alaska Natives pursuant to 43 U.S.C. §§ 1606(j), (m) (Supp. II, 1972) should displace the food stamp assistance to which the Natives would otherwise have been entitled. The language of the Settlement Act, in and of itself, supplies the strongest foundation for our conclusion. As quoted supra, Congress declared that the Settlement Act was not to " . . . diminish any obligation of the United States or of the State of Alaska to . . . promote the welfare of Natives . . .." 43 U.S.C. § 1601(c) (Supp. II, 1972). Further, Congress declared that " . . . no provision of (the Settlement Act) shall be construed to . . . curtail the activities of . . . Federal agencies . . . conducting grant programs in Alaska." 43 U.S.C. § 1601(g) (Supp. II, 1972).
 
 
 19
 We recognize that these statutory pronouncements are cast in general terms, as are all Congressional declarations of purpose, and that the statutory language does not specifically mention the food stamp program. Nevertheless, the legislative history contains numerous references to Congress's awareness that the Alaska Natives are, as a group, among the Nation's most impoverished and malnourished citizens. See, e. g., S.Rep.No.405, 92d Cong., 1st Sess. 72 (1971); H.R.Rep.No.523, 92d Cong., 1st Sess. 5-6 (1971) (1971 U.S.Code Cong. & Admin.News, pp. 2192, 2196); 117 Cong.Rec. 38439 (1971) (remarks of Senator Stevens). And it is undeniable that the Food Stamp Act represents a principal Congressional effort to improve the welfare of the Nations poor. We cannot believe that Congress declared that the Settlement Act was not to replace or diminish on-going Federal and State programs for improving the Alaska Natives' welfare without intending thereby to exclude settlement payments from consideration in determining whether Native households are eligible for food stamp assistance.[7]
 
 
 20
 We also find support for our conclusion in another theme that appears throughout the legislative materials pertaining to the Settlement Act. The House committee report recites that in determining the amount of the settlement award, Congress considered the following:
 
 
 21
 the extreme poverty and underprivileged status of the Natives generally, and the need for adequate resources to permit the Natives to help themselves economically. The Natives constitute about one-fifth of the total population of the State, but they are almost completely lacking in the capital needed to compete with the non-Native population and to raise their standard of living through their own efforts. The money grant in this bill is intended to provide that capital.
 
 
 22
 H.R.Rep.No.523, 92d Cong., 1st Sess. 5-6 (1971) (1971 U.S.Code Cong. & Admin.News, pp. 2192, 2196). See also 117 Cong.Rec. 46967-68 (1971) (remarks of Senator Gravel). The Congress expressly intended, through the Settlement Act, to provide the Alaska Natives with capital that can form the basis for long-range personal and economic growth. The contested decision of the Secretary would encourage, or even require, the very poorest of the Alaska Natives, i. e., those who would otherwise be eligible for food stamps, to dissipate their settlement awards for current consumption. Such a result would, in our view, be wholly at odds with the Congressional aim.
 
 
 23
 It bears emphasis that in making this determination, we are primarily concerned with the proper construction of the Settlement Act, taking into account the special character of payments made under the Act. We are only incidentally concerned with the general meaning of "resources" as that term is used in the Food Stamp Act and regulations promulgated thereunder.
 
 
 24
 We have carefully considered the Secretary's view that Settlement Act payments are "resources" as that term is defined in the food stamp regulations.[8] But we cannot accept the Secretary's contention that his position is entitled to "great weight" and that, consequently, his decision must be upheld unless it is manifestly unreasonable. Our obligation is to determine, by interpreting the relevant portions of the Settlement Act, whether Congress intended that settlement funds should be considered as "resources." Since the Secretary is not charged with the responsibility for implementing the Settlement Act,[9] his views as to the Act's meaning are entitled to no more than ordinary deference. Courts accord "great weight" only to the interpretations given a statute by the agency charged with the statute's administration. Cf. United States v. Florida East Coast Railway Co., 410 U.S. 224, 236 n.6, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973).[10]
 
 
 25
 The District Court's Order denying preliminary relief is reversed. Upon remand, the District Court will permanently enjoin the appellees from deeming payments received by Alaska Natives pursuant to 43 U.S.C. § 1606(j), (m) (Supp. II, 1972) as "resources" for the purpose of determining whether Native households are eligible for food stamps.[11] The District Court will also prescribe such other relief as may be necessary to restore the eligibility for food stamps to those Native households that have been denied food stamps because of the Secretary's decision that settlement payments are "resources" and to compensate Native households that may have been overcharged for food stamps because of the Secretary's actions.
 
 
 26
 Reversed and remanded with directions.
 
 
 
 *
 Honorable Fred M. Taylor, Senior United States District Judge, District of Idaho, sitting by designation
 
 
 [1]
 In the District Court, the plaintiffs named as defendants the Secretary of Agriculture, two other officials of the United States Government, and three officials of the State of Alaska. On this appeal, the three State officials have filed a brief in support of the appellant Natives, urging reversal of the District Court's decision to deny a preliminary injunction
 
 
 [2]
 The term "Alaska Native" is defined at 43 U.S.C. § 1602(b) (Supp. II, 1972)
 
 
 [3]
 In the District Court, the plaintiffs also sought to enjoin the defendants from considering Settlement Act payments as "income" for the purpose of determining whether Native households are eligible for food stamps. A household is not eligible for food stamps if either its "income" or its "resources" is too great. See 7 C.F.R. § 271.3 (1975). Reasoning that settlement payments were paid in exchange for the Natives' aboriginal titles, the District Court concluded that such payments were not "income" and preliminarily enjoined the defendants from considering the payments as "income" in food stamp eligibility determinations. Hamilton v. Butz, Civ.No. A74-142 (D.Alaska, Filed Dec. 11, 1974). The Secretary filed an interlocutory appeal, docketed in our court as No. 75-1269, from the preliminary injunction. On April 9, 1975, however, the Secretary moved voluntarily to dismiss appeal No. 75-1269. That motion of the Secretary is hereby granted. See Fed.R.App.P. 42(b)
 
 
 [4]
 Aboriginal title is based on the use and occupancy of land by aboriginal peoples. See generally Tee-Hit-Ton Indians v. United States, 348 U.S. 272, 279-82, 75 S.Ct. 313, 99 L.Ed. 314 (1955)
 
 
 [5]
 See 43 U.S.C. § 1602(j) (Supp. II, 1972)
 
 
 [6]
 Alaska officials estimate that from 7 to 8 thousand Alaska Natives receiving settlement payments have also applied for food stamps. The number of Natives denied food stamps because of the Agriculture Department's decision to consider settlement payments as "resources" is to us unknown
 
 
 [7]
 At oral argument, counsel for the Secretary agreed that the food stamp program was within the purview of the language of 43 U.S.C. § 1601(c) (Supp. II, 1972)
 
 
 [8]
 Other administrative officers have disagreed with the Secretary's view. The Alaska State officials responsible for administering the food stamp program within the State's borders originally concluded that the Settlement Act precluded consideration of settlement payments as "resources," but the State officials were overruled by the Secretary. The State officials continue to oppose the Secretary's opinion. See supra n.1. The Secretary of Health, Education and Welfare has concluded that Congress did not intend that settlement payments should be considered in determining whether Natives are eligible for the Aid to Families with Dependent Children (AFDC) and Supplemental Security Income (SSI) programs administered by his Department. The differing administrative views on the general question are documented and discussed in a Library of Congress report, reproduced at S.Rep.No.1354, 93d Cong., 2d Sess. 12-14 (1974)
 
 
 [9]
 Principal responsibility for administering the Settlement Act lies with the Secretary of the Interior
 
 
 [10]
 In the 93d Congress, the Senate passed a Bill which would have amended the Settlement Act by explicitly excluding settlement payments from consideration in determining whether Native households are eligible for food stamps. S. 3530, 93d Cong., 2d Sess. § 8 (1974). The Senate committee report reveals that the amendment was passed in response to the Secretary of Agriculture's decision to consider settlement payments in determining food stamp eligibility and that the amendment was intended to clarify, rather than change, the existing law. See S.Rep.No.1354, 93d Cong., 2d Sess. 4, 12-14 (1974). The House of Representatives failed to consider S. 3530 before the 93d Congress adjourned. An identical Bill, S. 131, 94th Cong., 1st Sess. § 7 (1975), has been introduced in the current Congress
 In our view, these Congressional efforts to resolve the question whether Congress intended to exclude settlement funds from consideration in food stamp eligibility determinations are inconclusive. As counsel for the Secretary correctly observes, the proposed amendment has not been enacted. But it is also true that the repeated introduction of the proposed amendment, and its favorable treatment in the Senate, reveal that Congress has not acquiesced in the Secretary's interpretation of the Settlement Act.
 
 
 [11]
 Certain other Federal grant funds are already excluded from consideration as "resources" in food stamp eligibility determinations. See 7 C.F.R. § 271.3(c)(4)(iii)(e)-(f) (1975)