DOYON, LIMITED et al.,
Plaintiffs-Appellees,

v.

BRISTOL BAY NATIVE CORP.,
Defendant-Appellant.

DOYON, LIMITED et al.,
Plaintiffs-Appellees,

v.

ARCTIC SLOPE REGIONAL CORP.,
Defendant-Appellant.

DOYON, LIMITED et al.,
Plaintiffs-Appellees,

v.

CALISTA CORP., Defendant-Appellant.

DOYON, LIMITED et al.,
Plaintiffs-Appellees,

v.

KONIAG, INC., Defendant-Appellant.

DOYON, LIMITED et al.,
Plaintiffs-Appellees,

v.

NANA REGIONAL CORP., INC.,
Defendant-Appellant.

DOYON, LIMITED et al.,
Plaintiffs-Appellees,

v.

SEALASKA CORP., Defendant-Appellant.

DOYON, LIMITED et al.,
Plaintiffs-Appellees,

v.

COOK INLET REGION,
Defendant-Appellant.

DOYON, LIMITED et al.,
Plaintiffs-Appellees,

v.

AHTNA, INC., Defendant-Appellant.

DOYON, LIMITED et al.,
Plaintiffs-Appellees,

v.

13TH REGIONAL CORP.,
Defendant-Appellant.

DOYON, LIMITED et al.,
Plaintiffs-Appellees,

v.

CHUGACH NATIVES, INC.,
Defendant-Appellant.

DOYON, LIMITED et al.,
Plaintiffs-Appellees,

v.

Cecil D. ANDRUS, Secretary of the Interior and W. Michael Blumenthal, Secretary of the Treasury, Defendants-Appellants.

Nos. 76–3658, 76–3681 to 76–3685, 76–3710, 76–3754, 76–3748, 77–1166 and 77–1084.

United States Court of Appeals,
Ninth Circuit.

Feb. 3, 1978.

Rehearing and Rehearing En Banc
Denied May 25, 1978.

John J. Zimmerman (argued), Dept. of Justice, James R. Atwood, Washington, D. C., James F. Vollintine, Hal R. Horton, Anchorage, Alaska, Gerald D. Stoltz, Washington, D. C., Milton M. Souter, Kodiak, Alaska, Edward Weinberg, Richard A. Baenen (argued), E. Foster DeReitzes, Washington, D. C., Joseph Rudd, Anchorage, Alaska, Jonathan Blank, Washington, D. C., for defendants-appellants.

Arthur Lazarus, Jr. (argued), Washington, D. C., for plaintiffs-appellees.

Before WRIGHT, CHOY and ANDERSON, Circuit Judges.

CHOY, Circuit Judge:

## FACTS AND PROCEEDINGS BELOW

Appellees Doyon, Ltd. and Bering Straits Native Corporations, together with the eleven corporate appellants,[1] constitute the

---

1. Ahtna, Inc., the Aleut Corporation, Arctic Slope Regional Corporation, Bristol Bay Native Corporation, Calista Corporation, Chugach Na- tives, Inc., Cook Inlet Region, Inc., Koniag, Inc., NANA Regional Corporation, Inc., Sealaska Corporation, and the 13th Regional Corpora-

Alaska Native Regional Corporations (Regional Corporations) created pursuant to the Alaska Native Claims Settlement Act, 43 U.S.C. §§ 1601 *et seq.* (ANCSA). Corporate appellants and the Secretaries of the Interior and the Treasury[2] appeal from a district court Memorandum and Order granting summary judgment in favor of appellees. We reverse.

ANCSA's primary purpose is to provide a "fair and just settlement of all claims by Natives and Native groups of Alaska, based on aboriginal land claims." 43 U.S.C. § 1601(a). Accordingly, each of the twelve regions has been subdivided into villages, and the Alaska Native Village Corporations (Village Corporations) have been established. 43 U.S.C. § 1607.

To effectuate the legislative plan, an Alaska Native Fund (Fund) has been created, into which $962,500,000 will ultimately be deposited for distribution to the Regional Corporations. 43 U.S.C. § 1605. The fund is to be parceled out in quarterly installments to the Regional Corporations according to the "relative numbers of Natives enrolled in each region." 43 U.S.C. § 1605(c).

*In lieu* of sharing in Fund distribution, 43 U.S.C. § 1618(b) gave Native villages situated on reserve lands[3] the option to acquire title to the surface and subsurface land in fee. Doyon Region villages of Tetlin, Venetie, and Arctic Village, and Bering Straits Region villages of Elim, Gambell, and Savoonga elected to acquire title to their reserves in this manner. As fee owners they do not have to share the revenues derived from their land with their respective Regional Corporations. On the other hand, these villages are *not* entitled to receive stock in the Regional Corporations and accordingly, forfeit the right to receive distributions from the Fund.[4]

In December 1973 the Secretary of the Interior (Secretary) completed and certified enrollment of Natives in Regional and Village Corporations. Enrollment of all Natives was required before the reserve land election could take place, but only those Natives not making the land election became shareholders of their respective regions. Distribution from the Fund based on numbers of Natives enrolled and holding stock in each region began. 43 U.S.C. § 1605(c).[5] The Secretary *excluded* Natives living in landed villages in calculating the distributive shares for Doyon and Bering Strait Regions.

Doyon and Bering Straits protested the exclusion and initiated suit. The United States District Court for the District of Alaska held that Natives with title to fee land were *includable* for calculations of distributive shares from the Fund.[6] *Aleut*

---

tion. Each of these corporations embraces a region, except the 13th Regional Corporation which was established for the benefit of non-resident natives who elected to be enrolled in it.

2. The Secretary of the Interior is the government official primarily responsible for implementing the provisions of the Act, and the Secretary of the Treasury has custody of all funds deposited in the Alaska Native Fund.

3. "Reserve land" refers to land which has been set aside in Alaska by legislation or Executive or Secretarial Order for Native use and administration of Native affairs prior to the effective date of the Act.

4. Title 43 U.S.C. § 1618(b) provides in part:
   [T]he Village Corporation shall not be eligible for any other land selections under this chapter or to any distribution of Regional Corporation funds pursuant to section 1606 of this title, and the enrolled residents of the

Village Corporation shall not be eligible to receive Regional Corporation stock.

5. As a direct result of the lower court's order construing 43 U.S.C. § 1605(c) against the Secretary and the defendant corporations, approximately $14,768,402 from the Alaska Native Fund will be directed to plaintiff corporations at the expense of the other Regional Corporations. The appellants would receive approximately $12,225 *per stockholder*, while plaintiffs Doyon and Bering Straits would receive $12,819 and $14,298, respectively, *per stockholder*.
   In contrast, if nonstockholders are not counted, all Regional Corporations will receive precisely the same amount of money *per stockholder*, approximately $12,464 each.

6. Title 43 U.S.C. § 1605(c) provides:
   After completion of the roll prepared pursuant to section 1604 of this title, all money in the Fund, except money reserved as provided in section 1619 of this title for the payment of attorney and other fees, shall be

*Corp. v. Arctic Slope Regional Corp.*, 417 F.Supp. 900, 904–06 (D.Alaska 1976).

■ The sole issue on appeal is whether Native members of villages which elected to take title to reserve lands in lieu of all other benefits under the Act may be counted by the Regional Corporations for purposes of calculating their proportional shares of the Fund.[7] We hold they cannot for the following reasons.

We conclude that: (1) the term "Native" in certain portions of the Act was intended to refer to *stockholders* of the Regional Corporations, and that legislative history demonstrates that only *stockholders* were intended to be counted in calculating distributive shares for each Regional Corporation; (2) appellants' argument for equality of benefits is viable in absence of evidence that Doyon and Bering Straits need a greater per-shareholder amount in order to provide services to villages holding land in fee; and (3) this Court will give great deference to the interpretation of the Secretary, the federal official with responsibility for administering the Act.

### CONSTRUCTION OF § 1605(c)

■ Title 43 U.S.C. § 1605(c) provides:
After completion of the roll prepared pursuant to section 1604 of this title, all money in the Fund, . . . shall be distributed . . . on the basis of the relative numbers of *Natives* enrolled in each region. (emphasis added).

Based on this language, according to the district court, Natives who are not stockholders are to be included to determine the distributive share for Doyon and Bering Straits even though they may not participate in the distribution. We disagree.

Formerly, statutory construction in this Circuit was dominated by the "plain meaning rule" which precluded the use of extrinsic evidence to determine the meaning of a statute, the language of which seemed clear on its face. *See I. T. T. Corp. v. G. T. & E. Corp.*, 518 F.2d 913, 917–18 (9th Cir. 1975); *Easson v. C. I. R.*, 294 F.2d 653, 656 (9th Cir. 1961). *But see Greyhound Corp. v. United States*, 495 F.2d 863, 868 (9th Cir. 1974). However, in light of a recent Supreme Court case, the viability of that rule is questionable, and it appears that

> [w]hen aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination.'

*Train v. Colorado Pub. Interest Research Group, Inc.*, 426 U.S. 1, 10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (1975) (footnotes omitted), citing *United States v. American Trucking Ass'ns*, 310 U.S. 534, 543–44, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940). We find that under the more flexible Supreme Court approach the present circumstances require exploration of extrinsic evidence because "Natives enrolled in each region" is susceptible to two different interpretations.

Relevant legislative history leads us to conclude that Congress intended the regions to share as nearly as possible on an equal basis, and did not intend to sanction disparate distribution of the Fund based on unforeseen semantic problems.[8] For example, the House Committee on Interior and Insu-

---

distributed at the end of each three months of the fiscal year among the Regional Corporations organized pursuant to section 1606 of this title on the basis of the relative numbers of Natives enrolled in each region. The share of a Regional Corporation that has not been organized shall be retained in the Fund until the Regional Corporation is organized.

7. The court's resolution of this issue will not only have an immediate and direct effect on the amount of Fund monies that will reach each individual Native, but will also, by implication, affect each Regional Corporation's share of natural resource revenues and land allocations

under sections 1606(i) and 1611(b), respectively, since they contain the same operative phrase "Natives enrolled."

8. *E. g.,* Appellees argue that while express language prohibits landed Natives from receiving shares from the Fund, nothing prohibits their Regional Corporations from receiving monies on behalf of villages making the fee land election. Such interpretation of this statute represents a torturing of Congressional intent expressly aimed at equality of benefits. *See* 43 U.S.C. § 1601(a).

lar Affairs reporting on an earlier version of the Act, which contained the same operative language—"Natives enrolled in each region"—discussed the distribution of resource revenues:

> In order that all Natives may *benefit equally* from any minerals discovered within a particular region, each corporation must share its mineral revenues with the other 11 corporations *on the basis of the relative numbers of stockholders in each region.*

H.Rep. 92–523, 92d Cong., 1st Sess. 6, *reprinted in* [1971] U.S.Code Cong. & Ad. News 2192, 2196 (emphasis added).

Secondly, appellants argue and we agree that the entire scheme of the Act treats all eligible Natives on an equal basis with respect to the monetary portions of the settlement, and that this may only be accomplished by excluding landed Natives in calculating distributive shares.

A report by the Senate Committee on Interior and Insular Affairs, discussing the settlement bill which initially passed the Senate, S. 35, 92d Cong., 1st Sess. (1971), stated:

> The settlement is statewide and applies to all Alaska Native groups; all eligible Natives regardless of their ethnic affiliation or their location are entitled to an *equal share* in assets provided as compensation for claims extinguished in the settlement.

S.Rep. 92–405, 92d Cong., 1st Sess. 79 (1971) (emphasis added).

While a literal reading of § 1605(c) authorizes Natives who are not stockholders to be included in the calculations defining distribution shares for Doyon and Bering Straits, such construction is inconsistent with Congress' expressed desire for equality.[9] We therefore hold that only stockholders are to be counted in calculating distributive shares for each Regional Corporation.

## JOINT REGIONAL AND VILLAGE CORPORATION VENTURES

Two sections of the Act allude to joint ventures between Regional and Village Corporations. Doyon and Bering Straits maintain that such joint ventures cannot be successfully carried out by them unless they receive a greater per-shareholder distribution than regions without landed villages. Title 43 U.S.C. § 1606(*l*) provides:

> Funds distributed to a Village Corporation may be withheld until the village has submitted a plan for the use of the money that is satisfactory to the Regional Corporation. The Regional Corporation may require a village plan to provide for joint ventures with other villages, and for joint financing of projects undertaken by the Regional Corporation that will benefit the region generally. In the event of disagreement over the provisions of the plan, the issues in disagreement shall be submitted to arbitration, as shall be pro-

---

9. Insertion of the word "Native" rather than stockholder may have resulted from the complex scheme for organizing individuals entitled to assert claims under the Act. Necessarily, enrollment was required prior to the election to take land in fee because the enrollment of villages determined the vote required for a village to effect the election.

Title 43 U.S.C. § 1607(a) provides:

> The Native residents of each Native village entitled to receive lands and benefits under this chapter shall organize as a business for profit or nonprofit corporation under the laws of the State before the Native village may receive patent to lands or benefits under this chapter, except as otherwise provided.

But ANCSA viewed as a whole plainly does not intend to favor Natives in regions which happened to contain villages making the election. For example, 43 U.S.C. § 1606(g) provides:

> The Regional Corporation shall be authorized to issue such number of shares of common stock, . . . as may be needed to issue one hundred shares of stock to each Native enrolled in the region . . . .

The Act's language taken literally authorizes the Regional Corporations to issue as many shares of stock as is necessary to provide 100 shares to "each *Native* enrolled in the region." (emphasis added).

It now appears that Congress intended that each *Native eligible to receive Regional Corporation stock* would be issued exactly 100 shares. To reach this result, the Regional Corporations should have been authorized to issue such number of shares of common stock as would be needed to provide 100 shares to each *stockholder*, that is, individual eligible to receive stock in the Regional Corporations.

vided for in the articles of incorporation of the Regional Corporation.

Title 43 U.S.C. § 1606(m) provides:

When funds are distributed among Village Corporations in a region, an amount computed as follows shall be distributed as dividends to the class of stockholders who are not residents of those villages: The amount distributed as dividends shall bear the same ratio to the amount distributed among the Village Corporations that the number of shares of stock registered on the books of the Regional Corporation in the names of nonresidents of villages bears to the number of shares of stock registered in the names of village residents: *Provided,* That an equitable portion of the amount distributed as dividends may be withheld and combined with Village Corporation funds to finance projects that will benefit the region generally.

These two sections require the Regional Corporations to be active participants in the development of their regions and not merely conduits for Fund distributions.

■ It appears, however, that Congress intended the joint ventures alluded to to benefit only the *stockholders* of the region—notwithstanding the language "projects that will benefit the region generally." Neither 43 U.S.C. § 1606(*l*) nor § 1606(m) seems applicable to the villages holding fee land since the Regional Corporation has no authority to control activities in those villages and the Natives are not entitled to receive distributions from the Fund or stock. Moreover, we can discern nothing in the Act or its history indicating that the Regional Corporations of Doyon or Bering Straits have any obligations or duties to those villages. On this basis we reject appellees' contention that they require a greater per-shareholder amount in order to provide services to the landed villages within their regions.

### DEFERENCE TO THE SECRETARY'S INTERPRETATION

After the Secretary initiated the distribution of the Fund, Doyon wrote him concerning a "serious error" made in calculating its share—the failure to count all Natives enrolled in the region. The Department denied Doyon's request for adjustment, stating:

Although Section 6(c) [43 U.S.C. § 1605(c)] provided for distributions of the . . . Fund . . . "on the basis of the relative numbers of Natives enrolled in each region" . . . we do not believe that the Congress could have intended to include for such purposes those individuals rendered ineligible . . . to participate in the redistributions. . . *Such an application . . . would result in a substantial and unjustified disparity of benefits among the stockholders of the various regional corporations which cannot be rationally supported.* (emphasis added).

The Secretary's decision was supported by a comprehensive memorandum stating that inclusion of landed Natives would result in a "windfall" for Doyon and Bering Straits.

■ The principal responsibility for administering the Act lies with the Secretary and his interpretations of the statute are entitled to "great weight" upon judicial review. *Hamilton v. Butz,* 520 F.2d 709, 714 & n. 9 (9th Cir. 1975); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1964). In *Tallman* the Supreme Court stated:

When faced with a problem of statutory construction, this Court shows *great deference* to the interpretation given the statute by the officers or agency charged with its administration. "To sustain the Commission's application of this statutory term, *we need not find that its construction is the only reasonable one,* or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." [citations omitted]. "Particularly is this respect due when the administrative practice at stake 'involves a contemporaneous construction of a statute by the men charged with the responsibility of setting its machinery in motion, of mak-

ing the parts work efficiently and smoothly while they are yet untried and new.'" [citation omitted]

380 U.S. at 16, 85 S.Ct. at 801 (emphasis added). *See also California ex rel. Dep't of Transp. v. United States ex rel. Dep't of Transp., Fed. Highway Administration,* 547 F.2d 1388, 1390–91 (9th Cir. 1977); *Patagonia Corp. v. Board of Governors of the Federal Reserve System,* 517 F.2d 803, 812 (9th Cir. 1975).

Additionally, Doyon and Bering Straits allege that "[t]o date the Secretary has evidenced no particular expertise" in the construction of the Act, and that the courts have "repeatedly rejected his interpretation and administration of the Claims Act." The Secretary's "track record" with respect to the administration and interpretation of the Act has no bearing on the weight to which his interpretations are entitled upon judicial review. The district court erred in failing to give the Secretary's interpretation of the term "Natives enrolled" the "great weight" or "great deference" to which it was entitled. *Hamilton v. Butz, supra; Udall v. Tallman, supra.* We find appellees' criticisms of other interpretations of the Act by the Secretary to be irrelevant to this review.

For the above reasons we hold that the district court's Memorandum and Order granting summary judgment in favor of appellees should be reversed, and that the Secretary's method of computation of the distributive shares for each region of the Fund should be continued.[10]

REVERSED.

J. BLAINE ANDERSON, Circuit Judge, dissenting:

Surely, the field of statutory construction so often confronted by justices and judges in the federal judicial system is one of the most prolific sources of differences of opin-

ion in a system where differences of opinion are endemic.[1] I respectfully dissent and add some support to this assertion.

For the reasons stated by the district judge, I would affirm (417 F.Supp. 900), but add thereto some further analysis and observations.

The district judge paid "some deference" to the Secretary's decision. He was required to do no more. Great deference to the Secretary's decision is usually required only where there has been a consistent construction by an administrative agency over a period of time, and within his expertise and power. That is not this case. The Secretary has no power or authority to "alter provisions that are clear and explicit _ _ _." He has no authority to avoid the direct "shall distribute" command of 43 U.S.C. § 1605(c). *Louisville & Nashville R. Co. v. United States,* 282 U.S. 740, 759, 51 S.Ct. 297, 75 L.Ed. 672 (1931); *Swain v. Brinegar,* 517 F.2d 766, 777 n. 14 (7th Cir. 1975); *Patagonia Corp. v. Board of Governors of Fed. Reserve System,* 517 F.2d 803, 812 (9th Cir. 1975). We have already declined to afford deference to the Secretary's attempt under ANSCA to establish a cutoff date for arbitration of land claims under 43 U.S.C. § 1606(a). *Central Council of Tlingit, et al. v. Chugach Native Ass'n,* 502 F.2d 1323, 1325 (9th Cir. 1974). There, as here, the language of Congress was an explicit command. The Secretary's decision here is new and has the appearance of being a "one-shot" conclusive determination on all future fund distributions which fly in the face of a direct Congressional command.

In my view there is no "fair contest between two readings" of the statute in question. "A problem in statutory construction can seriously bother courts *only* when there is a contest between probabilities of meaning."[2] (emphasis added) As I read the majority opinion, we have no such contest. We agree as to the meaning of "stockhold-

---

10. Appellants put forth a vague equal protection claim which we consider to be without merit.

1. See generally, Aldisert, *The Judicial Process,* pp. 170–235, West Publ. Co., 1976.

2. Frankfurter, *Some Reflections on the Reading of Statutes,* 47 Colum.L.Rev. 527 (1947).

er" and "Natives enrolled" wherever they appear in ANSCA. We also seem to agree in their logical placement in the various sections of the Act, save one.

The majority opinion, it seems to me, sets a bad potential precedent in appearing to sanction an executive departmental decision to "gerrymander" what are statutory words of clear and unambiguous meaning in order to effectuate the executive viewpoint of an equitable remedy rather than the legislative directive of remedy.

This is not a case of interpreting ambiguous wording in a vague statute. Nor can it be said that using the words in their statutory context leads to an absurd result.[3] In my opinion, even the most fair-minded person could not say with comfortable assurance that distribution under § 6(c) based on the measure of "Natives enrolled" leads to an uncontemplated inequitable result nor thwarts legislative purpose. The statutory words have a clear, definite, statutorily-defined meaning. Were the statutory structure and its policy and purpose vague[4] and its words ambiguous there could be no quarrel with the majority's approach. It would be permissible judicial interpretation thrust upon the court (either intentionally or negligently) by the Congress. Here the word "stockholder" and the phrase "Natives enrolled" both have clearly ascertainable meanings drawn from the Act itself and they make logical and cohesive sense in their usage in the various sections of the Act. Only when applied to a precise factual distribution of funds does the statute excite in some a feeling of inequity. This administratively perceived inequity then is transformed into statutory ambiguity and vagueness justifying the transposition of words having completely separate and distinct meanings into a new location within the statutory framework to achieve the administrator's perception of equity (i. e., "stockholder" to § 6(c) in place of "Natives enrolled"). Based on this logic, the Secretary assumes that Congress and its committees must have made a "mistake." However, the legislative history and records demonstrate beyond any realistic doubt that the language in question was knowingly and deliberately used by the Congress in constructing this legislation to deal with a pressing and complex problem. In addition, the Secretary and his aides participated extensively in assisting the Congress in its formulation of ANSCA. Substituting different words or phrases for otherwise clear ones is not statutory construction of vague or ambiguous language (the proper role of the judiciary in interpreting and construing statutes). Rather, it is purely and simply administrative and judicial "legislating" undertaken to correct a perceived Congressional "mistake" when there is no evidence to support the theory that there has, in fact, been a mistake made. Moreover, neither the Secretary, counsel for appellants, nor the majority cite any authority that the Secretary or this court is empowered to correct an alleged Congressional mistake in this context. "An omission at the time of enactment, whether careless or calculated, cannot be judicially supplied, however much later wisdom may recommend the inclusion." Frankfurter, *Some Reflections,* etc., supra, p. 534.[5]

3. In *I. T. T. Corp. v. G. T. E. Corp.,* 518 F.2d 913, 917–18 (9th Cir. 1975), we find that:

> "There are two circumstances in which this court may look beyond the express language of a statute in order to give force to Congressional intent: where the statutory language is ambiguous; and where a literal interpretation would thwart the purpose of the over-all statutory scheme or lead to an absurd result." (footnotes omitted)

4. There is no need for this court to search for or to speculate about the legislative policy or purpose nor for us to disagree once we find it. It is clearly and unambiguously stated in § 2(a)

and (b), of ANSCA (43 U.S.C. § 1601(a) and (b)). The Act is to provide an immediate and rapid "fair and just settlement of all claims" and "without litigation." The latter reinforces the observation, infra, that the Congress by the annual reporting requirements may well have reserved to itself the right and power to resolve inequities and the practical problems that develop with experience. In any event, "fair and just" does not mean perfect equality.

5. Recently we observed in *Patagonia Corp. v. Board of Gov. of Fed. Res. Systems,* 517 F.2d 803 (9th Cir. 1975), at p. 813, that it is logical to assume that where one word is used one way

The Congress, in this situation, is presumed to have known very well the scheme it constructed. It explicitly provided that a fund was to be distributed in accordance with the language and formula it set forth. It seems to me to be apparent that some potential for disparity in distribution must have been present in the minds of the Congressional constructors (here the disparity is only .016 of the total fund) and that here, as judges, we are not, therefore, confronted with the question of what the Congress would have intended had it been presented with the problem. The disparity is miniscule and we should not reconstruct the statutory distribution under some guise of judicial interpretation in order to subserve some evanescent Congressional intention or to promote some perceived but wholly obscure and mathematically unachievable social value or policy.

Although this statutory scheme has been amended several times since its adoption on December 18, 1971, the Congress has not corrected this alleged mistake. In spite of the apparent ease of amendment and the required annual reports, infra, there is no evidence in this case that the Secretary or the appellant Regional Corporations have presented their theory of mistake and inequity to Congress. Future Congressional appropriations will be made to fund the periodic distributions to the Regional Corporations. Sec. 6, 43 U.S.C. § 1605. By Congressional mandate the Secretary is required to submit to the Congress annual reports on the implementation of ANSCA (Sec. 23, 43 U.S.C. § 1622) until 1984 with a

final report in 1985 "with such recommendations as may be appropriate." It may be argued with some force that the Congress intended to reserve to itself the right and power to remedy real or imagined deficiencies or inequities. If in fact a mistake has been made or a substantial unintended inequity exists, Congress has ample time to correct it if it wishes to do so. In conclusion, I would affirm the district court and send the Secretary and appellants to the Congressional committee rooms to seek relief rather than to risk disruption of the comprehensive whole by a judicial transplant.[6]

---

in the statute it is used that way throughout, and that:

> "Our obligation in the imperfect process of statutory construction is to effectuate the Congressional intent, and, beyond doubt, the best evidence of that intent is the text of the statute itself. (cite omitted) We have found no evidence of a different Congressional intent that could justify our departing from the self-evident meaning of the statutory provisions here in question."

See also: *United States v. Gertz,* 249 F.2d 662, 665 (9th Cir. 1957), expressing the same view.

**6.** *United States v. Olympic Radio & Television, Inc.,* 349 U.S. 232, 236, 75 S.Ct. 733, 736, 99 L.Ed. 1024 (1955), teaches us that:

> "We can only take the [statute] as we find it and give it as great an internal symmetry and consistency as its words permit. We would not be faithful to the statutory scheme, as revealed by the words employed, if we gave [a word or phrase] a different meaning . . . than it has in the other parts of the same chapter."

> \*   \*   \*   \*   \*   \*

> "The fact that the construction we feel compelled to make favors the taxpayer on the cash basis and *discriminates* against the taxpayer on the accrual basis may suggest that changes in the law are desirable. But if they are to be made, Congress must make them." [emphasis supplied]