UKPEAGVIK INUPIAT CORPORATION,
Plaintiff,

v.

ARCTIC SLOPE REGIONAL
CORPORATION, Defendant,

Doyon, Ltd., Amici Curiae.

No. A81–326 Civil.

United States District Court,
D. Alaska.

July 15, 1981.

William J. Donohue, Kennelly, Azar & Donohue, Anchorage, Alaska, for plaintiff.

Douglas B. Baily, Baily & Mason, Anchorage, Alaska, David C. Crosby, Wickwire, Lewis, Goldmark & Schorr, Seattle, Wash., for defendant.

Elizabeth S. Taylor, Fairbanks, Alaska, Arthur Lazarus, Jr., Fried, Frank, Harris, Shriver & Kampelman, Washington, D. C., for amici curiae.

## MEMORANDUM AND ORDER

VON DER HEYDT, Chief Judge.

THIS CAUSE comes before the court on cross motions for partial summary judgment.

Plaintiff, Ukpeagvik Inupiat Corporation, initiated this action to obtain an accounting of all funds received by defendant, Arctic Slope Regional Corporation, pursuant to the Alaska Native Claims Settlement Act of 1971, 43 U.S.C. §§ 1601 et seq. (1976) ("ANCSA" or "the Act"), and to obtain

payments of all ANCSA funds to which it is entitled. Plaintiff is a Village Corporation organized pursuant to § 8. of ANCSA. Defendant is a Regional Corporation organized pursuant to § 7 of ANCSA.

In the cross motions for partial summary judgment, the court is asked to determine the distribution requirements of § 7(j) of ANCSA. 43 U.S.C. § 1606(j). Section 1606(j) requires a Regional Corporation to make certain cash distributions to Village Corporations and to region at-large stockholders.

## I. BACKGROUND

In enacting ANCSA, Congress intended to provide "a fair and just settlement of all claims by Natives and Native groups of Alaska, based on aboriginal land claims." 43 U.S.C. § 1601(a); see generally United States v. Atlantic Richfield Co., 435 F.Supp. 1009, 1014–19 (D.Alaska 1977), aff'd, 612 F.2d 1132 (9th Cir. 1980) (court traces history of Alaska Native land claims). To this end, Congress declared that "the settlement should be accomplished rapidly, with certainty, in conformity with the real economic and social needs of Natives . . . with maximum participation by Natives in decisions affecting their rights and property. . . ." 43 U.S.C. § 1601(b).

To accomplish a fair and just settlement in conformity with the Natives' economic and social needs, Congress created an Alaska Native Fund of $962 million,[1] id. § 1605, and provided fee title to over forty million acres of Alaska land.[2] To achieve maximum Native participation in decisions affecting their rights and property, Congress provided for the creation of twelve Native Regional Corporations[3] (in which every eligible Native would hold 100 shares of stock)

and over 200 Native Village Corporations. Id. §§ 1606, 1607.

### A. The Regional Corporation

Congress chose the corporation as the vehicle for implementing ANCSA. Pursuant to § 7(a) of the Act, the Secretary of the Interior divided Alaska into twelve geographic regions. The regions were divided, as far as practicable, so that any given region reflected the common heritage of the Natives within its area.

The Act then required the Natives within each region to form a Regional Corporation, pursuant to the corporate laws of Alaska, to conduct business for profit. 43 U.S.C. § 1606(d). Following incorporation, each Regional Corporation was required to issue 100 shares of stock to each eligible Native within its region. Id. § 1606(g). The issued stock entitled the Native holder to all the rights of a stockholder in an Alaskan corporation, except that alienation was restricted until 18 December 1991—twenty years after enactment. Id. § 1606(h).

#### 1. Regional Corporation Revenue Sharing

To "achieve a rough equality in assets among all the natives," Aleut Corp. v. Arctic Slope Regional Corp., 421 F.Supp. 862, 867 (D.Alaska 1976), aff'd in part and rev'd in part sub nom. Chugach Natives Inc. v. Doyon, Ltd., 588 F.2d 723 (9th Cir. 1979), Congress declared that seventy percent of all revenues received by each of the Regional Corporations from timber and subsurface revenues be shared among the twelve Regional Corporations. 43 U.S.C. § 1606(i). The sharing of income among the Regional Corporations was limited, however, to tim-

---

1. $462 million of the Alaska Native Fund was appropriated from the United States Treasury over an eleven year period. The remaining $500 million was to be received from certain mineral resources from state and federal land in Alaska. 43 U.S.C. § 1608.

2. ANCSA provides that twelve Alaskan Native Regional Corporations will hold the subsurface title to all forty million acres. Surface title to approximately 22 million acres is held by over 200 Native Alaskan Village Corporations. Sur-

face title to the remaining land lies with the Regional Corporations. Id. §§ 1611, 1613.

3. Section 7(c) of the Act allowed for the creation of an optional thirteenth Regional Corporation "[i]f a majority of all eligible Natives . . . who are not permanent residents of Alaska elect . . . to be enrolled in a thirteenth region. . . ." A thirteenth Regional Corporation was organized on 1 January 1976.

ber and subsurface revenues. Additionally, the resource revenue sharing mandated by § 1606(i) did not include the thirteenth Regional Corporation, which lacks any natural resources.

To illustrate, the Regional Corporation which earns revenues from its resources retains thirty percent of the net revenue, and divides the remaining seventy percent among the twelve Regional Corporations, including itself. The division is made in proportion to the number of Natives enrolled in each Regional Corporation. Section 1606(i) thereby achieves a rough equality by allowing for the fact that some regions are resource-poor, while others possess a wealth of natural resources.

### B. The Village Corporation

Pursuant to § 1607, Native residents of each Native village eligible for benefits under the Act were required to organize a profit or non-profit Village Corporation prior to receiving such benefits. Eligible villages were defined as communities, neither modern nor urban, composed of at least twenty-five Natives, with Natives representing at least fifty percent of the village population.[4] 43 U.S.C. § 1610(b)(2). See generally Arnold, et al., Alaska Native Land Claims, chs. 23, 25, 29 & 31 (1978 edition).

Although the Village Corporation does not hold stock in, and is not subsidiary to, the Regional Corporation,[5] the Act vests the Regional Corporation with certain Village Corporation control functions, and requires the Regional Corporation to be an active participant in the development of its region. Doyon, Ltd. v. Bristol Bay Native Corp., 569 F.2d 491, 496 (9th Cir. 1978), reh. den., 439 U.S. 954, 99 S.Ct. 352, 58 L.Ed.2d 345 (1978). The initial articles of incorporation for each Village Corporation are subject to approval by the local Regional Corporation. 43 U.S.C. § 1607(b). The Act requires the Regional Corporations to redistribute certain funds to Village Corporations,[6] id. § 1606(j), but allows the Regional Corporation to withhold such funds pending a satisfactory village plan. Id. § 1606(l). Additionally, the Act authorizes the Regional Corporation to withhold village funds "to finance projects that will benefit the region generally." Id. § 1606(m).

From a review of the Act's sections vesting Regional control over Village Corporations, it is clear that Congress perceived the Regional Corporation "as a device to provide guidance, assistance, and control for the use of funds by the Village Corporations." Price, Region-Village Relations Under The Alaska Native Claims Settlement Act, 5 UCLA–Alaska L.Rev. 58, 63 (1975). It is also clear that, following Regional Corporation approval of a satisfactory Village Corporation plan, and assuming no withholding to finance a regional project, cer-

---

**4.** There are over 200 Village Corporations, either specifically listed in the Act or eligible pursuant to the Act, 43 U.S.C. § 1610(b), of which the majority chose to organize as for-profit corporations. Some villages situated in reserve lands opted to acquire title to the surface and subsurface land, thereby waiving Alaska Native Fund and revenue sharing benefits. See Doyon, Ltd. v. Bristol Bay Native Corp., 569 F.2d 491, 493 (9th Cir. 1978), reh. den., 439 U.S. 954, 99 S.Ct. 352, 58 L.Ed.2d 345 (1978).

**5.** All eligible Natives within a particular region received 100 shares of Regional Corporation stock following incorporation. 43 U.S.C. § 1606(g). Regional Natives who also resided within an eligible village became village stockholders following village incorporation. Accordingly, village Natives became stockholders in their Village Corporation as well as their Regional Corporation, while Natives residing outside an eligible village became at-large Regional Corporation stockholders.

**6.** The Act's distribution scheme "treats all eligible Natives on an equal basis with respect to the monetary portion of the settlement." Doyon v. Bristol Bay, 569 F.2d at 495. The amount of funds received by a Village Corporation is based on the proportion of village stockholders to the total number of region stockholders. 43 U.S.C. § 1606(k). Thus, a village resident's proportionate share goes directly to the Village Corporation. Natives enrolled in a Regional Corporation, but residing outside an eligible village (at-large stockholders) receive their proportionate share directly. Id. § 1606(m). The at-large stockholders, however, do not hold land or otherwise benefit from Village Corporation activities.

tain ANCSA funds must be distributed to the Village Corporations and at-large stockholders. 43 U.S.C. § 1606(j). What specific funds must be distributed is, however, unclear.

## II. SECTION 1606(j) AND "NET INCOME"

Section 1606(j) provides:

During the five years following December 18, 1971, not less than 10% of all corporate funds received by each of the twelve Regional Corporations under section 1605 of this title (Alaska Native Fund), and under subsection (i) of this section (revenues from the timber resources and subsurface estate patented to it pursuant to this chapter), and all other net income, shall be distributed among the stockholders of the twelve Regional Corporations. Not less than 45% of funds from such sources during the first five-year period, and 50% thereafter, shall be distributed among the Village Corporations in the region and the class of stockholders who are not residents of those villages, as provided in subsection to it. In the case of the thirteenth Regional Corporation, if organized, not less than 50% of all corporate funds received under section 1605 of this title shall be distributed to the stockholders.

43 U.S.C. § 1606(j) (1976) (footnote omitted).

The distribution mandated by the first sentence of subsection (j) is not at issue. The first sentence requires the Regional Corporations, during the first five years following passage of the Act, to pay their stockholders at least ten percent of all corporate funds received from § 1605, from § 1606(i), and from all other net income. The first sentence is relevant, however, to the parties' disagreement regarding the construction of the second sentence, as the second sentence refers to the first in its distribution mandate.

The heart of the present dispute is whether the words "funds from such sources," used in the second sentence, mean that fifty percent of "all other net income" (first sentence) must be distributed, in perpetuity, among the Village Corporations and at-large stockholders. The parties agree that the second sentence requires a Regional Corporation to distribute funds received under § 1605 and § 1606(i).

Plaintiff contends that the plain meaning of the second sentence mandates distribution of fifty percent of "all other net income." Defendant asserts that, although subsection (j) is not a model of clarity, the use of the words "such sources" can only refer to the two distinct sources of corporate funds mentioned in subsection (j)—§ 1605 and § 1606(i) funds. The problem with both arguments is that both rely on the "plain meaning rule,"[7] to construe an ambiguous distribution requirement.

■ The Ninth Circuit Court of Appeals recently noted that the "plain meaning rule" has been relaxed. *United States v. Atlantic Richfield Co.*, 612 F.2d 1132, 1136 (9th Cir. 1980), *rehearing den.*, 449 U.S 888, 101 S.Ct. 244, 66 L.Ed.2d 113 (1980). Accordingly, the court may examine legislative history to help it construe statutory language which seems clear on its face. *Cf. Train v. Colorado Pub. Int. Research Group, Inc.*, 426 U.S. 1, 10, 96 S.Ct. 1938, 1942, 48 L.Ed.2d 434 (1976) (no rule of law precludes the use of aid to construction of the meaning of a statute's words, even when the words seem clear on superficial examination).

Here, the second sentence of subsection (j) is unclear regarding whether the words "from such sources" also refer to a Regional Corporation's "net income". Ambiguity is evident from the fact that commentators who have addressed the second sentence of subsection (j) have disagreed on whether net income must be distributed. Lazarus and West, *The Alaska Native Claims Settlement Act: A Flawed Victory*, 40 L. & Con-

---

**7.** The "plain meaning rule" precludes "the use of extrinsic evidence to determine the meaning of a statute, the language of which seem[s]

clear on its face." *Doyon v. Bristol Bay*, 569 F.2d at 494.

temp.Prob. 132, 162–64 (1976) (phrase "from such sources" not intended to encompass Regional Corporation net earnings); Price, *Region-Village Relations Under ANCSA*, 5 UCLA-Alaska L.Rev. 58, 62 n. 20 (1975) (resolve ambiguity regarding "all other net income" by requiring "net income" to be distributed under the second sentence). The fact that the "plain meaning rule" has been relaxed, coupled with the ambiguity of the second sentence, requires the court to analyze the relevant legislative history to aid in construction of subsection (j).

### A. Legislative History Regarding Net Income Distribution

#### 1. Prior Bills

The first bills introduced in Congress to settle Alaska Native land claims made no mention of corporations as vehicles for settlement. *E. g.*, S. 1964, 90th Cong., 1st Sess. (1967). Business corporations were first proposed as a means of implementing a settlement during the second session of the 90th Congress. *E. g.*, S. 2906, 90th Cong., 2d Sess. (1968). These bills, however, did not require any specific distribution following receipt of funds by the corporation. *Id.* § 306 ("money apportioned . . . shall be paid to the corporation for use in accordance with the annual budgets prepared by the corporation").

The first mention of specific distribution requirements occurred in later bills introduced during the 91st Congress. *E. g.*, S. 3041, 91st Cong., 1st Sess. (1969); H.R. 14212, 91st Cong., 1st Sess. (1969). These bills provided for an "Alaska Native Development Corporation," a non-profit entity consisting of all eligible Alaska Natives, which would initially receive all of the "Alaska Native Compensation Fund." *E. g.*, H.R. 14212 § 8. The Development Corporation would then distribute ninety-five percent of the Native Fund to twelve Regional Corporations. *Id.* § 8(f)(1).

Each Regional Corporation was "required to organize an affiliated non-profit mem-

bership corporation . . . devoted to promoting the health, welfare, education and economic and social well-being of Natives of the region. . . ." *Id.* § 9(f)(2)(A). The profit arm of the Regional Corporation was required to distribute to its affiliated non-profit arm between ten and fifty percent of all monies received from the Alaska Native Fund, and "all its other net income." *Id.* § 9(f)(2)(B). There was no fixed distribution requirement mandated to the non-profit arm of the Regional Corporation. The Act simply provided that the affiliated non-profit corporation may distribute to eligible Natives no more than twenty percent of the monies paid to it. *Id.* § 9(f)(2)(C).

The last two bills which preceded the enactment of ANCSA were introduced in the 92nd Congress. H.R. 10367, 92nd Cong., 1st Sess. (1971); S. 35, 92nd Cong., 1st Sess. (1971). S. 35 would have established an "Alaska Native Investment Corporation" and an "Alaska Native Services and Development Corporation" to receive Alaska Native Fund money. S. 35, 92nd Cong., 1st Sess. § 5(e)(1).

The Investment Corporation was to be a profit making corporation in which all eligible Natives were to be members. *Id.* § 10(g). The Investment Corporation was required to pay all Native stockholders total cash dividends of at least $1 million for the first five years following passage of the act. *Id.* § 10(h)(1). There was no specific net income distribution requirement.

The Services Corporation was to be a non-profit membership corporation, providing social services, as well as technical advice, financial assistance, and other related services to the Natives. *See id.* § 8(i). The Services Corporation was required to distribute Fund monies to the Village Corporations, the Regional Corporations, and the Urban and National Corporations [8] in accordance with the act. *Id.* § 8(f)(1). The sole source of these distributions was to be the Alaska Native Fund.

The only reference to net income in S. 35 was in § 9 dealing with Regional Corpora-

---

**8.** The Urban Corporation was to consist of Natives who did not qualify as members of a     Village Corporation. The National Corporation was to consist of Natives living outside Alaska.

**1260**

tions.[9] The bill stated that each Regional Corporation may organize an affiliated non-profit corporation "devoted to promoting the health, welfare, education, and economic well-being of the Natives of the region...." *Id.* § 9(f)(2)(A). The bill then provided that if a non-profit arm was formed the Regional Corporation may distribute to it between ten and fifty percent of Alaska Native Fund money, and all its other net income. *Id.* § 9(f)(2)(B). Clearly, this was not a mandatory net income distribution requirement.

The final House bill, H.R. 10367, was less complex and, in structure, similar to the final Act. Under the House bill, all Alaska Fund Money went to twelve Regional Corporations. H.R. 10367, 92nd Cong., 1st Sess. § 7(a)(2) (1971). The Regional Corporations would also receive title to the subsurface estate of all village lands. Although a Regional Corporation was required to share its natural resource income with the other Regional Corporations on a *per capita* basis, *id.* § 6(g), there was no required distribution of net income. The bill allowed a Regional Corporation to invest all "funds received and retained ... from any source ... for the production of income...." *Id.* § 6(h). There was no distribution requirement if the Regional Corporation used all its funds for investment in income and/or for social services.[10]

### 2. *The Conference Report*

In regard to the second sentence of § 1606(j), the joint House and Senate Conference Committee stated:

> Each Regional Corporation must distribute among the Village Corporations in the region not less than 50 percent of its

share of the $962,500,000 grant, and 50 percent of all revenues received from the subsurface estate. This provision does not apply to revenues received by the Regional Corporations from their investment in business activities.

Conference Rep.No. 92–746, 92nd Cong., 1st Sess. 36 (1971), *reprinted in* [1971] U.S.Code Cong. & Admin.News 2192, 2247, 2249.

Although the Conference Report contains several obvious misstatements,[11] and is less detailed than subsection (j) itself, the fact that the committee expressly stated that the fifty percent distribution requirement of § 1606(j) only applied to Alaska Native Fund monies and subsurface revenues, and not revenues received from investment, lends strong support to defendant's position.

### B. *§ 1606(j) Distribution and the Thirteenth Regional Corporation*

Further support for defendant's position is found in subsection (j)'s treatment of the thirteenth Regional Corporation. It is clear that the thirteenth Regional Corporation, lacking subsurface resources, does not participate in § 1606(i) revenue sharing. Nevertheless, the thirteenth Regional Corporation is organized to conduct "business for profit," and, like the other twelve Regional Corporations, has the potential of realizing "net income" from its investment activities. The last sentence of § 1606(j), however, makes no mention of a net income distribution requirement in regard to the thirteenth Regional Corporation. The last sentence simply provides: "In the case of the thirteenth Regional Corporation ... not less than 50% of all corporate funds

---

9. The bill provided for seven Regional Corporations. S. 35, 92nd Cong., 1st Sess. § 9 (1971).

10. The bill provided that no more than sixty percent of any funds not used for income production, administrative expenses, or social services, "shall be distributed among the incorporated Native villages and ... stockholders...." H.R. 10367, 92nd Cong., 1st Sess. § 6(h)(3).

11. An example of an obvious misstatement is the fact that the first sentence quoted reads the

at-large stockholders completely out of § 1606(j). Additionally, the first sentence quoted refers to "subsurface estate" and makes no mention of timber resources. The Committee was apparently referring to § 1606(i) resources when using the words "subsurface estate." The court notes that the quoted sentences would perfectly describe defendant's position regarding the Regional Corporations' duties to distribute under § 1606(j) after the first five-year period, if "§ 1606(i) resources" is substituted for the words "the subsurface estate."

received under section 1605 of this title [Alaska Native Fund] shall be distributed to the stockholders." 43 U.S.C. § 1606(j).

This last sentence of subsection (j) requires a distribution by the thirteenth Regional Corporation which is analogous to the distributions by the twelve Regional Corporations required in the second sentence of subsection (j). The fact that Congress clearly did not require the thirteenth Regional Corporation to distribute its net income leads to the conclusion that it intended a similar result in regard to the other twelve Regional Corporations.

■ From an analysis of § 1606(j), the court concludes that although the words "funds from such sources" are ambiguous, the legislative history of ANCSA as well as the treatment of the thirteenth Regional Corporation in subsection (j) resolve the ambiguity and make clear that "all other net income", as used in the first sentence, is not a "source" which must be distributed under the second sentence. Accordingly, the second sentence of subsection (j) does not require Regional Corporations to distribute any net income to Village Corporations and at-large shareholders.

### III. SECTION 1606(j) AND RESOURCE REVENUE DISTRIBUTION

As previously discussed, § 1606(i) requires each Regional Corporation to distribute seventy percent of all net revenues received from the timber and subsurface estate proportionately among the twelve Regional Corporations. Subsection (j) then provides in part that fifty percent of the "funds received by each of the twelve Regional Corporations under ... subsection (i) .... shall be distributed among the Village Corporations in the region" and the at-large stockholders in the region. Plaintiff maintains that given certain language in the Conference Report, subsection (j) requires each Regional Corporation to pay out one-half of its retained resource revenues as well as revenues received under subsection (i).

The Conference Report sentence relied upon by plaintiff states: "Each Regional Corporation must distribute among the Village Corporations in the region not less than 50 percent of its share of the $962,500,-000 grant [Alaska Native Fund], and 50 percent of all revenues received from the subsurface estate." Conference Rep.No. 92–746, 92nd Cong., 1st Sess. 36 (1971), reprinted in [1971] U.S.Code Cong. & Admin. News 2247, 2249. This sentence is inaccurate on its face regarding subsection (j) resource revenue sharing. The sentence fails to mention the subsection (j) distributive rights of the at-large stockholders, and wholly overlooks the fact that subsection (j) requires timber resources to be shared as well as revenues from the subsurface estate.

Additionally, subsection (j) requires "funds received ... under subsection (i)" to be distributed. (emphasis added). The only funds a Regional Corporation "receives" under subsection (i) are its proportionate share of the seventy percent which must be shared among the twelve Regional Corporations. The thirty percent exempt from subsection (i) sharing is retained by the resource-holding corporation. As the Ninth Circuit Court of Appeals has explained:

> [Section] 1606(i) ... provides that 70% of all revenues received by each Regional Corporation from timber and subsurface estate resources must be divided among all 12 Regional Corporations in proportion to the number of Natives enrolled in each region. At least 50% of the revenues so received must be redistributed among the Village Corporations.

*Chugach Natives v. Doyon*, 588 F.2d at 724 (emphasis added).

■ Finally, no prior Alaska Native settlement bill required Regional Corporations to make mandatory distributions of retained resource revenues to Village Corporations and at-large stockholders. The court concludes that § 1606(j) requires a Regional Corporation to distribute to Village Corporations and at-large stockholders its received seventy percent share of § 1606(i) resources, but not, in the case of a

resource-holding Regional Corporation, its thirty percent retained share.

## IV. *SECTION 1606 OF ANCSA*

It is clear from § 1606 that Congress intended the Regional Corporation to be the economic foundation which would allow the Natives to build upon the settlement, and which would preserve the benefits of the settlement for future Native generations. Therefore, a principal function of the Regional Corporation is to actively conduct business for profit. A successful profit-making Regional Corporation prevents dissipation of ANCSA funds by providing a secure capital base for investment. Moreover, a successful profit-making Regional Corporation will withstand the test of time and allow future Native generations to seek self-determination through stockholder participation in corporate affairs.

Finally, there is no legitimate reason, given the need for a strong economic foundation to build upon, to require the Regional Corporations to pay fifty percent of their net income and fifty percent of their retained § 1606(i) revenues to Village Corporations and at-large stockholders. Such a requirement would erode the economic strength of the Regional Corporations, and thereby weaken the foundation for the settlement, the Regional Corporations.

Accordingly, IT IS ORDERED:

1. THAT plaintiff's motion for partial summary judgment is denied.

2. THAT defendant's motion for partial summary judgment is granted.