CITY OF ANGOON, the Sierra Club, the Wilderness Society, et al., Plaintiffs-Appellees,

v.

Donald HODEL, Secretary of the Interior, et al., Shee Atika, Inc. and Sealaska Corp., Defendants-Appellants.

CITY OF ANGOON, the Sierra Club, the Wilderness Society, et al., Plaintiffs-Appellants,

v.

Donald HODEL, Secretary of the Interior, et al., Defendants,

and

Shee Atika, Inc., Defendant-Appellee.

Nos. 85–4413, 86–3582, 86–3617 and 86–3618.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 3, 1986.

Decided Oct. 31, 1986.

Frederick P. Furth, Jeffrey Glick, Furth, Fahrner, Bleumle & Mason, San Francisco, Cal., for City of Angoon.

Durwood Zaelke, Sierra Club Legal Defense Fund, Inc., Washington, D.C., for Sierra Club.

F. Henry Habicht, II, Asst. Atty. Gen., Bruce Landon, Atty., Dept. of Justice, Anchorage, Alaska, Robert L. Klarquist, David C. Shilton, Dept. of Justice, Washington, D.C., for Federal defendants-appellants.

Jonathan K. Tillinghast, Stephen F. Sorensen, Birch, Horton, Bittner, Pestinger & Anderson, Juneau, Alaska, for Sealaska Corp.

Richard Anthony Baenen, Pierre J. La-Force, Wilkinson, Barker, Knauer & Quinn, Washington, D.C., Jacquelyn R. Luke, Middleton, Timme & McKay, Anchorage, Alaska, for Shee Atika, Inc.

Before SNEED, KENNEDY, and WIGGINS, Circuit Judges.

PER CURIAM:

Appellants appeal from a partial summary judgment invalidating a permit for the construction and operation of a log transfer facility on Admiralty Island and enjoining its use. Jurisdiction to hear this appeal is provided by 28 U.S.C. § 1292(a)(1). The district court held that the environmental impact statement (EIS) prepared in connection with the permit was inadequate under the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. §§ 4321–4370a, because it failed to consider an alternative whereby the land on Admiralty Island could be exchanged for land elsewhere. Appellees cross-appeal from the district court's dismissal of their claims that proposed timber harvesting on Admiralty Island violates the Alaska Native Claims Settlement Act (ANCSA), 43 U.S.C. §§ 1601–1629a, and the Alaska National Interest Lands Conservation Act (ANILCA), Pub.L.

No. 96–487, 94 Stat. 2371 (1980) (codified as amended in scattered sections of 16 and 43 U.S.C.). Jurisdiction to hear this appeal is provided by 28 U.S.C. § 1291.

We reverse the district court's judgment invalidating the permit and enjoining use of the log transfer facility. We affirm in all other respects.

## I.

### FACTS AND PROCEEDINGS BELOW

Appellants, defendants below, are Shee Atika, Inc. (Shee Atika), an Alaska Native Village Corporation that claims a surface estate in some 23,000 acres of Admiralty Island; Sealaska Corporation (Sealaska), an Alaska Native Regional Corporation that owns subsurface rights in land owned by Shee Atika; federal officials in the Department of the Army who issue permits under section 404 of the Clean Water Act, 33 U.S.C. § 1344, and section 10 of the River and Harbor Act of 1899, 33 U.S.C. § 403; and other federal officials who administer laws relating to Native Americans. We refer to appellants collectively as Shee Atika-Sealaska.

Appellee cross-appellants, plaintiffs below, are the City of Angoon (Angoon), the only permanent settlement on Admiralty Island; the Sierra Club, and the Wilderness Society, both national conservation organizations. We refer to appellees collectively as Sierra-Angoon.

This litigation is the latest episode in a twelve-year struggle which reflects badly upon the ability of the three branches of the federal government to resolve disputes reasonably expeditiously. It is a struggle in which Shee Atika attempts to realize economic benefits from the settlement of its aboriginal claims under ANCSA. ANCSA authorized the Secretary of the Interior

(Secretary) to convey to Shee Atika a surface estate in some 23,000 acres of land. 43 U.S.C. § 1613(h)(3). In exchange, the Native shareholders of Shee Atika relinquished all their aboriginal claims.

In 1975, Shee Atika designated lands in the southwest portion of Admiralty Island for the exchange. The Sierra Club and Angoon immediately contested the conveyance. The Sierra Club wishes to protect the wilderness character of Admiralty Island. The President and Congress recognized the island's ecological importance by designating 920,000 of its 1.2 million acres as a national monument. Presidential Proclamation No. 4611, 3 C.F.R. 69 (1978); ANILCA, § 503(b), 94 Stat. 2371, 2399 (1980). Angoon is afraid that timber harvesting will disrupt the traditional subsistence culture of its 500 Tlinget Indian inhabitants.

Responding to pressure, Shee Atika agreed to exchange its land in the southwest of Admiralty Island for land in the northwest of the island. Its new selection is farther from Angoon and was rated environmentally less sensitive by the United States Forest Service. Excerpt of Record (E.R.) at 145. Congress approved the exchange in section 506(c) of ANILCA, 94 Stat. 2371, 2409.

The Sierra Club and Angoon challenged the new conveyance both before the Department of the Interior and in district court. The Sierra Club also filed a notice of *lis pendens* in the Alaska land records, which prevented Shee Atika from obtaining commercial financing for its timber development plans. Congress responded by enacting section 315 of the Interior Appropriations Act, Pub.L. No. 97–394, 96 Stat. 1998 (1983), which confirmed the conveyance to Shee Atika "in all respects."[1]

---

**1.** This was not Congress' last word on the subject. On January 9, 1986, Congress passed section 2(b) of Pub.L. No. 99–235, 99 Stat. 1761 (1986), which authorized the Secretary of the Interior to negotiate an agreement with Shee Atika under which timber harvesting on Admiralty Island would cease. On August 11, 1986, the House of Representatives passed the Admiralty Island Exchange Act, which proposes a

transfer of specified land in exchange for Shee Atika's Admiralty Island holdings. 132 Cong. Rec. H5810, H5816 (daily ed. Aug. 11, 1986). Senate action is imminent. These events took place after this appeal was filed. Neither congressional action casts doubt on Shee Atika's rights in its Admiralty Island land. Rather, both propose negotiating voluntary agreements with Shee Atika.

The Sierra Club and Angoon returned to district court to protest Shee Atika's plans to harvest timber on its land. They objected to the permit issued by the Army Corps of Engineers (Corps) for a log transfer facility on the ground that the Corps had not prepared an EIS as required by NEPA, 42 U.S.C. § 4332. The Corps suspended the permit in March, 1983, pending completion of an EIS. Shee Atika nevertheless harvested timber during the spring of 1983, moving the logs by means less efficient than a log transfer facility. The Sierra Club and Angoon interrupted this activity by obtaining a preliminary injunction against timber harvesting. They claimed, and the district court agreed, that ANILCA prohibits timber harvesting on Shee Atika's land because it is located within a national monument.

Shee Atika appealed to this court, and we vacated the preliminary injunction. *City of Angoon v. Marsh (Angoon I)*, 749 F.2d 1413 (9th Cir.1985). From the language and legislative history of ANILCA, we concluded that Congress did not intend to prohibit timber harvesting on private land located within national monuments. We also looked to the purpose of ANCSA, which authorized the conveyance to Shee Atika to settle its claims "in conformity with the real economic and social needs of Natives," 43 U.S.C. § 1601(b). It was "inconceivable that Congress would have extinguished their aboriginal claims and insured their economic well being by forbidding the only real economic use of the lands so conveyed." 749 F.2d at 1418.

On remand the district court consolidated four cases involving Shee Atika's land. Sierra-Angoon filed a consolidated complaint on April 29, 1985. They challenged the original conveyance to Shee Atika of land on Admiralty Island. They objected to the new permit for a log transfer facility which the Corps had issued after completing an EIS. And they protested all timber harvesting on Admiralty Island. Sierra-Angoon based their claims variously on provisions of ANCSA, ANILCA, NEPA, and the Clean Water Act; on the federal trust responsibility owed to Angoon; and on the due process and property clauses of the United States Constitution.

All parties moved for summary judgment. The district court disposed of the motions in two orders dated October 17, 1985; in a third order dated November 27, 1985; and in a partial final judgment dated December 27, 1985. The court granted partial summary judgment for Sierra-Angoon on their claim that the log transfer facility permit was invalid under NEPA because the EIS did not study an alternative by which Shee Atika could exchange its Admiralty Island land for land elsewhere. The court granted partial summary judgment for Shee Atika-Sealaska on all other claims, except a claim arising under section 402 of the Clean Water Act, 33 U.S.C. § 1342, which was still the subject of an administrative appeal.

As already indicated, Shee Atika-Sealaska appeal from so much of the November 27 order as held that the EIS was inadequate. Sierra-Angoon cross-appeal from so much of the judgment of December 27 as dismissed three of their claims. First, they claim that Congress conveyed the Admiralty Island land to Shee Atika intending that Shee Atika exchange it for land elsewhere and not use it for timber harvesting. Second, they claim that Shee Atika's land is subject to management restrictions under section 22(k) of ANCSA, 43 U.S.C. § 1621(k). Third, they challenge timber harvesting on Admiralty Island because certain federal agencies failed to prepare subsistence evaluations required by section 810 of ANILCA, 16 U.S.C. § 3120, and because the Secretary of the Interior failed to protect access to subsistence resources under section 811 of ANILCA, 16 U.S.C. § 3121.

## II.

### STANDARD OF REVIEW

This court reviews de novo a trial court's grant of summary judgment. *Darring v.*

*Kincheloe,* 783 F.2d 874, 876 (9th Cir.1986). The standard used by the trial court under Fed.R.Civ.P. 56(c) thus governs the appellate court's review. This court determines, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Id.*

## III.

## NATIONAL ENVIRONMENTAL POLICY ACT

It has been said many times that NEPA is an "essentially procedural" statute. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). We enforce NEPA under our authority to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law," Administrative Procedure Act, 5 U.S.C. § 706(2)(D). *Lathan v. Brinegar,* 506 F.2d 677, 692–93 (9th Cir.1974) (en banc). One of the procedures prescribed by NEPA is that:

all agencies of the Federal Government shall—

. . .

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

  (i) the environmental impact of the proposed action,

  (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

  (iii) alternatives to the proposed action,

  (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

  (v) any irreversible and irretrievable commitments of resources which

would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2).

This "detailed statement" is the EIS. The present case specifically tests the requirement that an EIS discuss "alternatives to the proposed action." In applying this requirement, we employ a "rule of reason" in judging whether the agency described "those alternatives necessary to permit a 'reasoned choice.' " *California v. Block,* 690 F.2d 753, 767 (9th Cir.1982) (citations omitted). "[T]he touchstone for our inquiry is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation." *Id.* In particular, an EIS need not consider "remote and speculative" alternatives whose effects cannot be readily ascertained. *Vermont Yankee,* 435 U.S. at 551, 98 S.Ct. at 1215 (quoting *Natural Resources Defense Council, Inc. v. Morton,* 458 F.2d 827, 837–38 (D.C.Cir. 1972)); *see Life of the Land v. Brinegar,* 485 F.2d 460, 472 (9th Cir.1973), *cert. denied,* 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974).

Before reissuing the permit for the log transfer facility, the Corps spent nineteen months preparing an EIS that is over 120 pages long, exclusive of maps, diagrams, and appendices. E.R. at 139. The EIS is technically sophisticated and analytically rigorous. It describes seven alternatives. One, the "no-action" alternative, considers the effects of denying the permit. The other six alternatives involve different ways of transferring logs either to the water for transport or directly on to vessels. The Corps finally approved an alternative that differs slightly from Shee Atika's original proposal. In addition, the Corps imposed twelve special conditions on the permit in order to mitigate adverse environmental effects. E.R. at 340–42.

The heart of the Sierra-Angoon argument is that the EIS is inadequate because it does not consider in detail the alternative that Shee Atika could exchange its Admiralty Island holdings for land elsewhere.

In fact, the Corps adverted to this possibility, but decided not to develop it at length. First, the Corps observed that an exchange would not satisfy the purpose for which Shee Atika sought the permit: "safe, cost effective means of transferring timber harvested on their land to market." E.R. at 163. Second, the Corps reasoned that the exchange alternative was remote and speculative because it was contingent on congressional action and had not been reduced to a specific proposal. *Id.* at 153, 170. Third, the Corps noted that, as far as it was concerned, the exchange alternative was equivalent to the no-action alternative because it could do no more to promote a trade. *Id.* And the Corps doubted whether it could properly withhold a permit in order to force Shee Atika to consent to an exchange that it otherwise would have refused. *Id.*

■ The district court considered and rejected each of the Corps' reasons for its abbreviated discussion of the exchange alternative. The district court attacked the Corps' statement of the permit's purpose. Purporting to rely on the Corps' regulations, the district court restated the purpose in terms of a broad, generic public benefit: "commercial timber harvesting." E.R. at 55. But the Corps' regulations recognize that "every application has both an applicant's purpose and need and a public purpose and need." 33 C.F.R. Part 230, App. B(11)(b)(4) (1985). The regulations, however, specify that "[t]he EIS shall document a reasonable number and range of alternatives which would satisfy the purpose and need (as described in paragraph 11(b)(4) above) for which the applicant has submitted his proposal." *Id.* at (11)(b)(5)(b). The Corps characterized the relevant "purpose and need" as providing a "safe, cost effective means of transferring timber

harvested on [Shee Atika's] land to market," E.R. at 163, a purpose broader than constructing a specific log transfer facility at a designated location in Cube Cove, as Shee Atika requested. The district court erred when it adopted as the "purpose and need" the even broader concept "commercial timber harvesting." This formulation appears to make a broad social interest the exclusive "purpose and need." The Corps' statement is more balanced. We have said before, "The preparation of [an EIS] necessarily calls for judgment, and that judgment is the agency's." *Lathan v. Brinegar,* 506 F.2d at 693.

Acceptance of the Corps' statement of purpose makes consideration of the exchange alternative irrelevant. *See Trout Unlimited v. Morton,* 509 F.2d 1276, 1286 (9th Cir.1974). When the purpose is to accomplish one thing, it makes no sense to consider the alternative ways by which another thing might be achieved.

However the permit's purpose is characterized, the exchange alternative is too remote and speculative. Congress explicitly conveyed the Admiralty Island land to Shee Atika, and Congress would have to authorize any substitute conveyance made in exchange. Shee Atika would have to consent. Should the tract to be exchanged be quite valuable, Congress might refuse to offer it; if it is less valuable, Shee Atika might refuse to accept it. To require the Corps to select one or more tracts for exchange which, in its view, might induce both an offer and acceptance is to visit upon it a task that would involve almost endless speculation.

■ It is true that the fact that an alternative requires legislative action does not automatically justify excluding it from an EIS.[2] The alternatives, however, must

---

2. If an alternative requires congressional action, it will qualify for inclusion in an EIS only in very rare circumstances. In *Natural Resources Defense Council, Inc. v. Morton,* 458 F.2d 827 (D.C.Cir.1972), the Court of Appeals for the District of Columbia Circuit held an EIS inadequate for failing to consider elimination of oil import quotas as an alternative to the sale of general oil

and gas leases of tracts on the outer continental shelf. *Id.* at 834–36. The court recognized that this alternative was outside the jurisdiction of the Department of the Interior, which prepared the EIS, and would require the President and Congress to act. But it observed that the lease sale was part of a coordinated plan to deal with the energy crisis, for which plan no program-

be ascertainable and reasonably within reach. Neither condition clearly was met when the EIS was prepared. Sierra-Angoon had not offered a specific, detailed counterproposal that had a chance of success. Those who challenge an EIS bear a responsibility "to structure their participation so that it is meaningful, so that it alerts the agency to the intervenors' position and contentions." *Vermont Yankee*, 435 U.S. at 553, 98 S.Ct. at 1216. Sierra-Angoon did not meet this responsibility. *See Friends of the Earth v. Coleman*, 513 F.2d 295, 298 (9th Cir.1975) (upholds district court decision that EIS did not have to consider alternative sites as sources of fill, where plaintiffs failed to allege specific evidentiary facts showing that the alternative sites were reasonable and viable); *Seacoast Anti-Pollution League v. Nuclear Regulatory Comm'n*, 598 F.2d 1221, 1231 (1st Cir.1979) (where petitioners fail to present supporting material, agency need not consider alternative sites for nuclear power plant). It follows, of course, that Sierra-Angoon has not demonstrated that timber harvesting at an alternative location would be environmentally less harmful than timber harvesting on Admiralty Island.[3] Nor can the Corps make this determination until an exchange becomes ascertainable. Until then, the consequences of an exchange are remote and speculative.

Our position draws support from the fact that since 1979, the federal government has been negotiating with Shee Atika without success for an exchange of the Admiralty Island land. We should not hold a log transfer facility as a hostage to facilitate the resolution of this intractable controversy. Shee Atika's need to benefit economically from ANCSA is urgent. 43 U.S.C. § 1601(b). To defer meeting this need while the Corps considers alternatives that none unilaterally can bring to pass would more resemble coercion than justice. The Corps properly eschewed development of a detailed exchange alternative.

Therefore we conclude that the EIS in issue here was adequate because it discussed all the alternatives that were reasonably necessary to enable the Corps to make an informed decision to grant the log transfer facility permit. We reverse the district court's judgment insofar as it invalidates the permit and enjoins use of the log transfer facility. Because the adequacy of an EIS is a legal question and no issue of material fact remains, we direct summary judgment for Shee Atika-Sealaska on the issue of the validity of the log transfer facility permit.

## IV.

### CONVEYANCE–FOR–EXCHANGE

Cube Cove was conveyed to Shee Atika and Sealaska by section 506 of ANILCA, 94 Stat. at 2409–12, which provides in relevant part:

(c)(1) In satisfaction of the rights of the Natives of Sitka, as provided in section 14(h)(3) of the Alaska Native Claims Settlement Act, the Secretary of the Inte-

---

matic EIS had been prepared. If each agency involved in the plan construed its alternatives narrowly, no EIS would address the environmental consequences of the fundamental policy choices. *Id.* at 835. Furthermore, the Department of the Interior could readily identify the environmental consequences of reducing oil import quotas. *Id.* at 837; *see id.* at 835–36.

In the case before us, the disputed permit is not part of a broader coordinated plan. Nor is the Corps well-placed to identify the environmental consequences of land exchanges and consequent timber harvesting elsewhere. Finally, Congress' decision to grant land on Admiralty Island to Shee Atika is recent, specific, and unlikely to be reversed (absent Shee Atika's consent). "[I]n deciding whether an alternative is reasonable, we may certainly take into account

the strength and vitality of legislation that forbids it." *Kilroy v. Ruckelshaus*, 738 F.2d 1448, 1454 (9th Cir.1984) (EIS need not consider alternative of discharging sewage sludge through ocean outfalls where Congress recently prohibited such disposal); *see Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 372 (D.C.Cir.) (once Congress authorizes specific dam and lock project, obligation to discuss alternatives is narrow), *cert. denied sub nom. Atchison, T. & S.F. Ry. Co. v. Marsh*, 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 630 (1981).

**3.** In this regard, it is significant that the Sierra Club opposes, on environmental grounds, the federal government's most recent exchange proposal, H.R. 4883.

rior, upon passage of this Act, shall convey subject to valid existing rights and any easements designated by the Secretary of Agriculture, the surface estate in the following described lands on Admiralty Island to Shee Atika, Incorporated:

[description of the Cube Cove land].

Concurrently with this conveyance, the Secretary shall convey the subsurface estate in the above described land to Sealaska, Incorporated. As a condition to such conveyances, Shee Atika, Incorporated, shall release any claim to land selections on Admiralty Island other than those lands described in this subsection [and Sealaska shall release any corresponding subsurface rights].

. . . .

(d) In recognition of the considerable land selection costs incurred by Shee Atika, Incorporated [and two other Native Corporations], in determining the validity of land withdrawals on Admiralty Island under section 14(h)(3) of the Alaska Native Claims Settlement Act, and in identifying suitable lands for exchange outside Admiralty Island, the Secretary of the Interior shall reimburse those corporations for such reasonable and necessary land selection costs, including all costs for negotiating land exchanges, court costs, and reasonable attorney's and consultant's fees, incurred prior to the date of conveyance of such land to such Native Corporations.

Sierra-Angoon assert that the Cube Cove land was conveyed to Shee Atika solely as a bargaining tool for a future exchange with the Department of Interior for other land, and not for the purpose of timber harvesting at Cube Cove itself.

Sierra-Angoon's only support for this assertion are some ambiguous, off-hand remarks of Senators in the uncorrected transcript of a Senate Committee mark-up session on ANILCA. Mark-up Session on S.9, Alaska Lands, Transcript of Proceedings, Senate Committee on Energy & Natural Resources, 96th Cong., 1st Sess. 531, 533, 534, 541 (1979). Shee Atika-Sealaska dispute the accuracy of the mark-up com-

ments and offer lengthy and persuasive legislative history indicating that the conveyance was *not* for exchange purposes only. They particularly point out ANILCA § 1302(b), 16 U.S.C. § 3192(b), which provides that "[l]ands located within the boundaries of a conservation system unit which are owned by . . . a Native Corporation or Native Group which has Natives as a majority of its stockholders . . . may not be acquired by the Secretary without the consent of the owner."

■ Sierra-Angoon's lack of support is telling, because the conveyance-for-exchange is Sierra-Angoon's major argument in the appeal, and many of the other arguments rely on this one. Most of the restrictions on the use of the Cube Cove land that Sierra-Angoon now urge would defeat any other purpose the conveyance might serve. Only if the conveyance was purely for the purpose of a future exchange are these restrictions compatible with it. We refuse to attribute to Congress the purpose to place such restrictions on land-use absent a clear expression of intent. In light of the history and context of section 506(c), we find the conveyance to Shee Atika was not for purpose of exchange only.

Sierra-Angoon argue at length that section 503(d) of ANILCA, 94 Stat. at 2400, should be applied to prevent timber harvesting on the Cube Cove lands. Section 503(d) provides:

Within the Monuments, the Secretary shall not permit the sale of [sic] harvesting of timber: *Provided,* That nothing in this subsection shall prevent the Secretary from taking measures as may be necessary in the control of fire, insects, and disease.

Except for the Cube Cove inholding, Admiralty Island consists entirely of public lands. Sierra-Angoon argue that logging is already prohibited on the *public* lands on Admiralty Island by virtue of sections 503(b), (c), and (f)(1), relying on "common sense" readings of the sections (i.e., the establishment of a Monument, the provision for its protection, and the withdrawal of the land from disposition imply that the

land will not be logged). Subsection (d) must therefore apply to the Cube Cove inholding, Sierra-Angoon argue, or the subsection is superfluous. As Shee Atika-Sealaska point out, however, none of the other sections cited prohibits timber harvesting, either expressly or by reference to another statute. *Cf.* 16 U.S.C. § 472a(a) (timber harvesting not per se prohibited in National Monuments).

Sierra-Angoon also argue that their interpretation of section 503(d) is compelled by the "underlying protective purposes" of ANILCA. *See Southeast Alaska Conservation Council, Inc. v. Watson,* 697 F.2d 1305, 1309 (9th Cir.1983). They cite a number of restrictions on the uses of the public lands on Admiralty Island and argue that allowing Shee Atika unrestricted use of the remainder of the island is anomalous. They also cite a number of restrictions on private land use involving other national preserves and monuments.

All of these are arguments the court considered in *Angoon I,* 749 F.2d at 1415–18.[4] The court considered the legislative history and the purpose of ANILCA and held that reading section 503(d) to prohibit logging on the Cube Cove inholding would forbid the land's only real economic use and defeat the purpose of section 506(c)'s conveyance of the land. The court therefore concluded that section 503(d)'s prohibition against the harvest of timber "within the Monument[ ]" applied only to *public* lands within the Monument and *not* to Shee Atika's private land. *Id.* at 1418.

Sierra-Angoon appear to raise one new argument that was not addressed by the *Angoon I* panel. They argue that timber harvesting is *not* the only economically feasible use of the Cube Cove land. Sierra-Angoon claim that the Cube Cove land has value that can be realized by exchanging the Cube Cove land for other land that would presumably have more direct utility. Sierra-Angoon note that the government may trade lands of equal or even greater value for the Shee Atika land, *see* ANILCA § 1302(h), 94 Stat. at 2475; ANCSA § 22(f), 43 U.S.C. § 1621(f), and that many Native Corporations have made such exchanges at premiums as high as thirty percent.

This argument is in essence identical to Sierra-Angoon's argument that Congress conveyed the Cube Cove inholding to Shee Atika *solely* for the purpose of a future exchange. If Congress intended the conveyance to confer an economic benefit on Shee Atika and at the same time in section 503(d) prohibited Shee Atika from logging, then Congress must have conveyed the Cube Cove inholding solely for the purpose of exchange. As discussed above with regard to section 506(c) itself, the provision for *voluntary* exchange makes this conclusion unreasonable.

Sierra-Angoon next argue that, even without section 503(d), section 503(c) of ANILCA, 94 Stat. at 2399–400, imposes a duty on the government to mitigate the effects of any timber harvesting on Admiralty Island. Section 503(c) provides:

> Subject to valid existing rights and except as provided in this section, the National Forest Monuments (hereinafter in this section referred to as the "Monuments") shall be managed by the Secretary of Agriculture as units of the National Forest System to protect objects of ecological, cultural, geological, historical, prehistorical, and scientific interest.

Sierra-Angoon cite a number of other specific statutes that impose such duties on the government and court cases that uphold the government's power to perform them. Sierra-Angoon then cite the "irreparable damage to the Monument" that

---

**4.** Shee Atika urges us to treat *Angoon I* as law of the case on these issues and others. *Angoon I* was an interlocutory appeal from a preliminary injunction. "As a general rule, decisions on preliminary injunctions do not constitute law of the case and 'parties are free to litigate the merits.'" *Golden State Trans. Corp. v. City of Los Angeles,* 754 F.2d 830, 832 n. 3 (9th Cir.

1985), (quoting *City of Anaheim v. Duncan,* 658 F.2d 1326, 1328 n. 2 (9th Cir.1981)), *rev'd on other grounds,* —— U.S. ——, 106 S.Ct. 1395, 89 L.Ed.2d 616 (1986). We will not depart from our general rule in this case. But our independent consideration of the issues leads us to approve the conclusions reached in *Angoon I.*

would result from timber harvesting at Cube Cove and conclude that the Secretary is required to mitigate this harm. The court concluded in *Angoon I* that such a reading of section 503(c) would inhibit the only economic benefit of the section 506(c) transfer. This conclusion is still sound and we follow it here.[5]

## V.

## DURATION OF HARVESTING RESTRICTIONS

Sierra-Angoon also argue that timber harvest on the Cube Cove inholding is subject to section 22(k) of ANCSA, 43 U.S.C. § 1621(k), which provides:

> Any patents to lands under this chapter which are located within the boundaries of a national forest shall contain such conditions as the Secretary deems necessary to assure that:
>
> (1) the sale of any timber from such lands shall, for a period of five years, be subject to the same restrictions relating to the export of timber from the United States as are applicable to national forest lands in Alaska under rules and regulations of the Secretary of Agriculture; and
>
> (2) such lands are managed under the principle of sustained yield and under management practices for protection and enhancement of environmental quality no less stringent than such management practices on adjacent national forest lands for a period of twelve years.

The federal regulations implementing section 22(k) interpret these time limits as running from the date of enactment (Dec. 18, 1971), and thus both time limits have now expired. *See* 43 C.F.R. § 2650.4–5 (1985). Sierra-Angoon argue that the regulation misinterprets the statute. Because the *patent* must contain the conditions, they argue, the plain language of the statute requires that the conditions run from

the date of conveyance, not the date of enactment.

We will affirm the Secretary's interpretation of section 22(k) if it is within the range of reasonable meanings of the statute's language and it comports with the statute's purposes. *See Sudomir v. McMahon,* 767 F.2d 1456, 1459 (9th Cir. 1985). Section 22(k) is itself silent about the date from which the time periods are to run, and the remainder of the statute makes Congress' intent no clearer.

Sierra-Angoon cite a number of other provisions of ANCSA that specify time periods that expressly begin on the date of enactment, *e.g.,* sections 2(c), 7(b), 12(c)(3), and 17(d)(2)(B) (43 U.S.C. §§ 1601(c), 1606(b), 1611(c)(3), and 1616(d)(2)(B)). They ask the court to infer that, by failing to tie the section 22(k) time periods to the date of enactment, Congress intended that the periods run from the only other plausible date, the date of conveyance. This inference is a weak one at best. Other provisions of ANCSA contain similar ambiguous time limitations. The phrase "for a period of five years" appears in a similar context in section 22(c), 43 U.S.C. § 1621(c), and we have construed that time limitation to run from the date of enactment. *Alaska Miners v. Andrus,* 662 F.2d 577 (9th Cir.1981). Further, Sierra-Angoon expect a degree of consistency that cannot be presumed in the context of complex legislation such as ANCSA. The substance of section 22(k) appeared for the first time as section 23(v) of S.35 less than two months before final passage of ANCSA, and achieved its present form during a hurried Senate floor debate on the day the Senate passed its version of the bill. 117 Cong.Rec. 38,465–66 (1971). The ambiguity appears to result more from accident than design.

The legislative history is inconclusive. Sierra-Angoon rely on the rejection on the Senate floor of an amendment to the statute that would have explicitly started the

---

5. Since we find the Secretary had no duty to mitigate the harm caused by the Cube Cove harvesting, we need not decide whether, as the Sierra Club argues, the Secretary should have

mitigated that harm by reserving easements in Shee Atika's grant under ANCSA § 17(b), 85 Stat. at 708.

time period from the date of enactment. They cite the following exchange:

Mr. GRAVEL.... I wonder if we could dot the "i," and provide the 5 years would run from enactment of this legislation. Would my colleague agree on that point?

Mr. STEVENS. This would make it 5 years. That could be discussed in conference.

117 Cong.Rec. 38,466 (1971) (remarks of Senators Gravel and Stevens). The failure to "dot the 'i'" might at worst reflect a disagreement about the application of section 22(k) that Congress chose to leave to the Secretary to resolve, not a "rejection" of an amendment. *Cf. Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 865, 104 S.Ct. 2778, 2793, 81 L.Ed.2d 694 (1984) (Congress can leave to appropriate agency resolution of competing statutory policies). Indeed, subsequent legislative history suggests congressional acquiescence to 43 C.F.R. § 2650.4–5. In considering ANILCA, Congress acknowledged the Secretary's interpretation of section 22(k), but did not see fit to overturn it. The Senate report on ANILCA states that ANCSA "restricts the management of lands conveyed from the national forests to native corporations for 12 years. This 12–year period runs from the date of [ANCSA] through December, 1983." S.Rep. No. 413, 96th Cong., 1st Sess. 261–62 (1979), *reprinted in* 1980 U.S. Code Cong. & Admin.News 5070, 5205–06.

The Secretary has the principal responsibility for administering ANCSA and his interpretation is entitled to deference. *Doyon Ltd. v. Bristol Bay Native Corp.,* 569 F.2d 491, 496 (9th Cir.), *cert. denied,* 439 U.S. 954, 99 S.Ct. 352, 58 L.Ed.2d 345 (1978). Sierra-Angoon urge us not to defer to the Secretary's interpretation because, they argue, the agency has not held a consistent view of the statute. *See, e.g., Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944). They note that two proposed versions of 43 C.F.R. § 2650.4–5 measured the section 22(k) time periods from the date of conveyance, *see* 38 Fed.Reg. 6505–06 (1973); 37

Fed.Reg. 19,636 (1972), while the final regulation adopted time periods from the date of enactment without explaining the change. But the inconsistency the courts have frowned upon is in *official* interpretations. To hold a final interpretation must be consistent with draft regulations would deprive the rulemaking process of flexibility, transforming proposed regulations into official actions that agencies would be hesitant to reconsider. *See International Harvester Co. v. Ruckelshaus,* 478 F.2d 615, 632 (D.C.Cir.1973).

The Secretary's interpretation is entitled to great deference as a "longstanding contemporaneous administrative construction," upon which interested persons are likely to have relied. *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 120, 100 S.Ct. 2051, 2062, 64 L.Ed.2d 766 (1980). Native corporations that built facilities to service the "round log" export market using timber from lands conveyed to them under ANCSA may have relied upon 43 C.F.R. § 2650.4–5 for assurances that their exports would be free of restriction. If we were to read the section 22(k)(1) export restrictions as still operative today, their investments could be impaired.

Sierra-Angoon urge us not to defer to the agency because the interpretation issue requires no agency expertise. We disagree. The Secretary's interpretation of section 22(k) involved a reconciliation of competing policies that entailed "more than ordinary knowledge" of the regulated matters. *Chevron U.S.A.,* 467 U.S. at 844, 104 S.Ct. at 2783 (quoting *United States v. Shimer,* 367 U.S. 374, 382, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)). Congress intended ANCSA and section 22(k) to accomplish several competing goals, including: (1) to create viable, profitable Native Corporations, *see Ukpeagvik Inupiat Corp. v. Arctic Slope Regional Corp.,* 517 F.Supp. 1255, 1262 (D.Alaska 1981); (2) to prevent "haphazard and disjointed management" of forest lands until the Native Corporations could develop their own management plans to govern the tracts they selected, S.Rep.

No. 405, 92d Cong., 1st Sess. 164 (1971); (3) to prevent the Native Corporations from immediately selling off their resources to raise capital the government would be providing them over the ensuing ten years anyway, *see* 117 Cong.Rec. 46,965 (1971) (remarks of Sen. Stevens); and (4) to cushion the blow to local sawmills that relied on export restrictions applicable to timber taken from Forest Service lands.

The Secretary's interpretation furthered the creation of profitable Native Corporations by lifting export restrictions at an early date. It also limited "haphazard and disjointed management" by setting a date certain for the expiration of the time limits. Starting the time running from the date of conveyance would result in a confusing, staggered set of limits, especially for Native Corporations (such as Sealaska) that have received different parcels at different times. It limited Native exploitation of the lands for five years, the time period intended to be required for federal distribution of the majority of the money settlements; *see* ANCSA § 6(a), 43 U.S.C. § 1605(a). And it gave the local timber industry breathing space during a limited transitional period to prepare for the relaxation of import restrictions. The Secretary's interpretation should not be disturbed unless it is unreasonable. *See Chevron U.S.A.*, 467 U.S. at 844, 104 S.Ct. at 2782. We find it to be consistent with both the statute's policies and its literal language.

## VI.

### SUBSISTENCE RIGHTS

Sierra-Angoon assert that section 810 of ANILCA, 16 U.S.C. § 3120, requires "subsistence evaluations" of various government actions: the Secretary's conveyance of Cube Cove to Shee Atika under section 506(c) of ANILCA; the issuance of permits by the EPA and Corps for the log transfer facility under sections 402 and 404 of the Clean Water Act, 33 U.S.C. §§ 1342 and 1344; the Bureau of Indian Affairs' loan to Shee Atika; and the Forest Service's

"duty" pursuant to ANILCA § 503(c) and ANCSA § 22(k) to protect the monument lands. Section 810(a) provides in relevant part:

In determining whether to withdraw, reserve, lease, or otherwise permit the use, occupancy, or disposition of public lands under any provision of law authorizing such actions, the head of the Federal agency having primary jurisdiction over such lands or his designee shall evaluate the effect of such use, occupancy, or disposition on subsistence uses and needs, the availability of other lands for the purposes sought to be achieved, and other alternatives which would reduce or eliminate the use, occupancy, or disposition of public lands needed for subsistence purposes.

As the language indicates, this provision affects agency determinations of "whether to lease or otherwise permit the disposition of public lands." *Village of Gambell v. Clark,* 746 F.2d 572, 579 (9th Cir.1984). The district court concluded that the government had taken no action affecting "public lands" and that section 810(a) was therefore inapplicable.

■ Sierra-Angoon argue that the spillover effect of the private use of Cube Cove on the subsistence use of the public lands on the rest of Admiralty Island brings the government's actions within section 810(a). The government's actions, they argue, make the logging operation both possible (the conveyance) and economically feasible (the log transfer facility permit, the loan), and the logging operation in turn affects the public lands of the monument. Sierra-Angoon urge the court to read section 810 broadly, *see Gambell,* 746 F.2d at 581, and to focus on the actual effects on public lands of the government actions authorizing use of private lands. *Cf. Adler v. Lewis,* 675 F.2d 1085, 1091–92 (9th Cir. 1982) (under 49 U.S.C. § 1653(f), highway construction activities that significantly adversely affect public park lands "use" the park lands).[6]

---

**6.** Sierra-Angoon also argue that the EPA's and

Corps' granting of permits under sections 402

■ Even if we were to read "public lands" this broadly, however, subsistence evaluations would not be required here for several reasons. First, none of the agencies Sierra-Angoon cite has "primary jurisdiction" over the public lands used for subsistence, as required by section 810. Second, the agency that does have such jurisdiction, the Department of Agriculture, has taken no action regarding the Cube Cove land that would invoke section 810. *Cf. Alaska v. Andrus*, 591 F.2d 537, 540 (9th Cir.1979) (inaction insufficient to require an EIS under NEPA). In addition, other provisions of ANILCA tend to belie the applicability of section 810 to private lands. *E.g.*, ANILCA § 802(3), 16 U.S.C. § 3112(3) ("Federal land managing agencies ... shall cooperate with adjacent landowners and land managers, including Native Corporations...."); *id.* § 810(d), 16 U.S.C. § 3120(d) ("After compliance ..., the head of the appropriate Federal agency may manage or dispose of public lands under his primary jurisdiction....").

It seems likely that, as Sierra-Angoon argue, a subsistence evaluation of the government's Cube Cove actions would be beneficial and consistent with the purpose of ANILCA. The plain language of the statute, however, cannot fairly be read to require such an evaluation for actions regarding private lands. Sierra-Angoon argue strenuously that they are not advocating regulating private lands but only spillover "use" of public lands. This seems a distinction without a difference. We affirm the district court's holding that section 810 is inapplicable to Shee Atika's use of Cube Cove.

Sierra-Angoon also claim that Shee Atika's activities will violate the Angoon residents' rights to continued subsistence uses of Admiralty Island under section 506(a)(2) of ANILCA, 94 Stat. at 2407. Section 506(a)(2) provides:

> Nothing in this section shall affect the continuation of the opportunity for subsistence uses by residents of Admiralty Island, consistent with title VIII [ANILCA §§ 801–816, 16 U.S.C. §§ 3111–3126] of this Act.

■ The district court found that section 506(a)(2) did not apply to the conveyance to Shee Atika under section 506(c). We agree. As used in the statute, "this section" refers only to section 506(a), which granted other Admiralty Island lands to a different Native Corporation, Kootznoowoo, Incorporated, and not to the whole of section 506, which includes the grant to Shee Atika. Each of subsections (a), (b), and (c) of section 506 involves a separate Native Corporation and is independent of the others. Subsection 506(a)(2) is placed between two other provisions, subsections 506(a)(1) and 506(a)(3), that exclusively concern the Kootznoowoo grant. We conclude that Congress intended subsection 506(a)(2) to apply only to the Kootznoowoo grant.

Sierra-Angoon argue that "this section" is the whole of section 506 and that the restrictions of 506(a)(2) are compatible with the conveyance to Shee Atika because the land was conveyed for the purpose of exchange (discussed *supra*, section IV). They also argue that section 506(a)(2) would be superfluous if it did not apply to the Shee Atika inholding because Angoon's subsistence use of public lands is already protected by sections 503(b), (c), and (f)(1),

and 404 of the Clean Water Act, 33 U.S.C. §§ 1342 and 1344, required a section 810 subsistence evaluation because these determinations used "public land": namely, a navigational servitude. "Public land" is defined to include all interests in land in which the United States holds title. ANILCA § 102(1)–(2), 16 U.S.C. § 3102(1)–(2). Since the United States does not hold title to the navigational servitude, the servitude is not "public land" within the meaning of ANILCA. *See United States v. Virginia Elec. & Power Co.*, 365 U.S. 624, 627–28, 81 S.Ct. 784,

787–88, 5 L.Ed.2d 838 (1961) (servitude is "power of government to control and regulate navigable waters in the interest of commerce") (quoting *United States v. Commodore Park*, 324 U.S. 386, 390, 65 S.Ct. 803, 805, 89 L.Ed. 1017 (1945)). For similar reasons, the Secretary was not required to perform a section 810 evaluation prior to transferring the Cube Cove lands to Shee Atika. Cube Cove is simply not "public land." *See* ANILCA §§ 102(3)(B) and 810(c), 16 U.S.C. §§ 3102(3)(B) and 3120(c).

and title VIII. Under our view that "this section" is only section 506(a), however, the provision has meaning and yet does not affect the Shee Atika conveyance.

In a similar vein, Sierra-Angoon argue that the protections of section 506(a)(2) must be broader than those of title VIII or the former is superfluous. However, Congress probably included the phrase "consistent with title VIII" to ensure section 506(a) did not undermine title VIII, not to provide broader protections.

Sierra-Angoon also assert that the Secretary breached his duty under ANILCA § 811, 16 U.S.C. § 3121, to guarantee residents of Angoon access to their subsistence lands. Section 811(a) provides:

> The Secretary shall ensure that rural residents engaged in subsistence uses shall have reasonable access to subsistence resources on the public lands.

Sierra-Angoon assert that the Angoon residents' traditional use of Cube Cove as a point of access to the other public lands in the Monument requires the Secretary to restrict Shee Atika's logging, road building, and other projects in Cube Cove to accomodate that use. Although Shee Atika's activities may have some of the effects Sierra-Angoon assert, the language of section 811(a) must be stretched a long way to allow—much less require—the Secretary to restrict the use of *private* land to assure access to subsistence resources on public lands. We affirm the district court's grant of summary judgment on this issue.

## VII.

### CONCLUSION

In light of ANILCA's grant of Cube Cove to Shee Atika, the 1982 legislation confirming it, and the 1986 legislation recognizing it, we hold Congress intended Shee Atika to have the opportunity to harvest timber on the Cube Cove land and not merely to be able to exchange it for another parcel. We reverse the district court's judgment invalidating the permit for the construction and operation of the log transfer facility and enjoining use of the facility. We affirm in all other respects.

REVERSED IN PART AND AFFIRMED IN PART.